Ernie FLETCHER, in His Official Capacity as Governor of the Commonwealth of Kentucky, Appellant

v.

Hon. William L. GRAHAM, Judge, Franklin County Circuit Court, Appellee.

and

Gregory D. Stumbo, in His Official Capacity as Attorney General for the Commonwealth of Kentucky Real Party in Interest

No. 2005–SC–1009–MR.

Supreme Court of Kentucky.

May 18, 2006.

Sheryl G. Snyder, Thomas P. O'Brien, III, Jason Patrick Renzelmann, Frost Brown Todd, LLC, Louisville, James L. Deckard, General Counsel, Office of the Governor, Frankfort, Counsel for Appellant.

Pierce Butler Whites, Assistant Deputy Attorney General, Scott C. Sutherland, Assistant Attorneys General, Jennifer B. Hans, Janet M. Graham, Assistant Attorneys General, Frankfort, Counsel for Appellee/Real Party in Interest.

Opinion of the Court by Justice JOHNSTONE.

In an original action before the Court of Appeals, Appellant, Governor Ernie Fletcher, in his official capacity as Governor of the Commonwealth of Kentucky, sought a writ of mandamus directing the Franklin Circuit Court to issue supplemental instructions to a special grand jury. This special grand jury had been summoned by the Attorney General to investigate allegations of criminal violations of the state's merit system hiring scheme. While the grand jury was in the process of investigating these allegations, and after several indictments had been issued against executive branch employees, Governor Fletcher issued an executive order pardoning all criminal conduct that was under investigation by that special grand jury. Following the issuance of the pardon, Governor Fletcher moved the Franklin Circuit Court to instruct the grand jury concerning the effect of the pardon—to wit, that the grand jury had no authority to issue further indictments for pardoned conduct. The Franklin Circuit Court declined to issue the supplemental instructions, prompting Governor Fletcher to seek a writ of mandamus in the Court of Appeals. The Court of Appeals denied the petition, determining that the pardon, though valid, did not compel the circuit court to issue supplemental instructions to the grand jury investigating the pardoned offenses. Governor Fletcher appealed to this Court as a matter of right. For the reasons set forth herein, we affirm in part and reverse in part.

### Background

The investigation began in May 2005, when an employee of the Kentucky Trans-portation Cabinet contacted the Attorney General and presented evidence of alleged criminal violations of the state merit employee hiring system.[1] On May 25, 2005, upon motion of the Attorney General, the Franklin Circuit Court summoned a special grand jury. For several months, the grand jury proceeded to investigate the matter and eventually issued several indictments against executive branch employees alleging both misdemeanor violations of the merit system laws and felony violations concerning evidence and witness tampering. Some three months into the investigation, on August 29, 2005, Governor Fletcher issued Executive Order 2005–924, whereby he sought to pardon nine individuals indicted by the grand jury as well as "any and all persons who have committed, or may be accused of committing, any offense up to and including the date hereof, relating in any way to the current merit system investigation."[2]

Notwithstanding the pardon, the grand jury continued its work and issued indictments for pardoned offenses. In response, Governor Fletcher moved the Franklin Circuit Court to supplement its instructions to the grand jury. Specifically, Governor Fletcher sought an instruction advising the grand jury that "pardoned conduct that preceded the pardon is no longer an indictable offense and therefore cannot constitutionally form the basis for an indictment." Governor Fletcher further asked that the grand jury be instructed that pardoned persons may not be indicted "solely for the purposes of naming them in a report." The Franklin Circuit Court denied the Governor's motion, instead telling the grand jurors that the Governor's pardon had no bearing on their work what-

---

1. *See* KRS Chapter 18A.

2. Reference to any persons indicted during the pendency of this appeal are inappropriate,

as such matters have not been made a part of the record before us.

soever. While recognizing the Governor's constitutional authority to issue pardons, the trial court concluded that the requested instructions would impermissibly infringe upon the grand jury's independence. Rather, the trial court determined that the grand jury could continue issuing indictments, even against pardoned persons, though such indictments would immediately be dismissed.

Governor Fletcher then petitioned the Court of Appeals for a writ of mandamus directing the Franklin Circuit Court to deliver the requested instructions. The Court of Appeals denied the petition, ultimately concluding that the Governor's pardon, though valid, did not oblige the circuit court to instruct the grand jury concerning the effect of the pardon. Governor Fletcher now appeals to this Court as a matter of right.

**Standard of Review**

We first address our standard of review of a request for a writ of mandamus. A writ of mandamus is essentially a command from a higher court to "stop some action which is threatened by or is being proceeded with by an inferior court." [3] It has long been characterized as an "extraordinary remedy" [4] that is granted conservatively and only in "exceptional situations." [5] Accordingly, a writ of this nature is granted for only two purposes: (1) when the lower court is acting beyond its jurisdiction, and (2) when the lower court is acting or is about to act erroneously, and there exists no adequate remedy by

appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted. [6] In reviewing the grant or denial of a writ of mandamus, the standard of our review depends on the nature of the writ and the circumstances of the case. [7] Generally speaking, however, the basic standard of review of the grant or denial of a writ is abuse of discretion, while questions of law are reviewed de novo. [8]

Here, the Governor sought a writ of mandamus of the second category, and the Court of Appeals determined that the petition was properly before the court. Noting that Governor Fletcher sought to completely prohibit indictments for pardoned offenses rather than simply prevent erroneous indictments, the Court of Appeals agreed that no adequate remedy by appeal existed. The Court of Appeals further found that the potential "insult" to the Governor's pardoning power fulfilled the "great and irreparable injury" requirement. The Attorney General now argues that the Court of Appeals erred in its holding that great and irreparable injury would potentially result from the denial of the requested writ.

We agree with the Court of Appeals' determination that the prerequisites for a writ of mandamus—*i.e.*, no adequate remedy by appeal, and great and irreparable harm—were met in this instance. Because the Governor specifically seeks to prevent the indictment of any pardoned person, it would not be an adequate reme-

3. *Stafford v. Bailey,* 301 Ky. 155, 191 S.W.2d 218, 219 (1945).

4. *Clark v. Jones,* 258 S.W.2d 902 (Ky.1953).

5. *Haight v. Williamson,* 833 S.W.2d 821, 823 (Ky.1992).

6. *Newell Enterprises, Inc. v. Bowling,* 158 S.W.3d 750, 754 (Ky.2005).

7. *Grange Mutual Insurance Co. v. Trude,* 151 S.W.3d 803, 810 (Ky.2004). ("Thus, it is apparent that the proper standard [of appellate review] actually depends on the class, or category, of writ case.")

8. *Newell,* 158 S.W.3d at 754.

dy to simply dismiss any indictments as they were issued. As the Court of Appeals noted, "a post-indictment remedy ... would not protect the interests the Governor asserts." We also concur with the Court of Appeals' holding that, if his arguments are correct, the Governor faces great and irreparable injury. The Governor alleges a violation of the separation of powers, as well as misconstruction of his constitutional power to pardon; correction of this possible error is certainly "necessary and appropriate in the interest of orderly judicial administration." [9] Accordingly, the Court of Appeals did not abuse its discretion in concluding that the procedural prerequisites for a writ of mandamus were satisfied in this case.

### Supplemental Instructions to the Grand Jury

Turning to the merits of the case, we must first determine the validity of the August 29 pardon, as the circuit court would be under no obligation to instruct the grand jury concerning a legally ineffectual document. The pardon, contained in Executive Order 2005–924 read, in pertinent part:

> [B]y virtue of the authority vested in me by Section 77 and related provisions in the Constitution of the Commonwealth of Kentucky. I ERNIE FLETCHER, Governor of the Commonwealth of Kentucky, do hereby grant a full, complete, and unconditional pardon to James L. Adams, Darrell D. Brock, Jr., Danny G. Druen, Tim Hazlette, Charles W. Nighbert, Cory W. Meadows, Richard L. Murgatroyd, Basil W. Turbyfill, Robert W. Wilson, Jr., and any and all persons who have committed, or may be accused of committing, any offense up to and including the date hereof, relating in any way to the cur-

rent merit system investigation being conducted by the special grand jury presently sitting in Franklin County, Kentucky and the Office of the Attorney General .... The provisions of this Order shall not apply to Ernie Fletcher, Governor of the Commonwealth of Kentucky.

The Attorney General challenges the scope of the Governor's pardon on three grounds: (1) that Section 77 does not authorize general, or blanket, pardons; (2) that pardons may not be granted prior to indictment; and (3) that formal acts of acceptance are essential to a valid pardon. We first address the issue of the so-called "blanket" pardon.

██ The Attorney General maintains that the language of Section 77 does not expressly authorize blanket pardons, which are pardons issued to classes of persons rather than specified individuals. Here, though the Governor does pardon nine identified individuals, the pardon also included a class of persons: "any and all persons who have committed, or may be accused of committing, any offense up to and including the date hereof." The Governor argues that nothing in the language of Section 77 prohibits this type of general or blanket pardon, and that the governor's power to issue general pardons has long been recognized. We agree.

██ Section 77 provides: "[The Governor] shall have power to remit fines and forfeitures, commute sentences, grant reprieves and pardons, except in case of impeachment, and he shall file with each application therefor a statement of the reasons for this decision thereon, which application and statement shall always be open to public inspection." When interpreting constitutional provisions, our focus

9. *Grange,* 151 S.W.3d at 808.

rests on the express language of the provision, and words must be given their plain and usual meaning.[10] This Court is "not at liberty to construe ... plain and definite language of the Constitution in such a manner as to thwart the deliberate purpose and intent of the framers of that instrument."[11] In fact, our predecessor Court recognized as a "cardinal rule" of constitutional interpretation the principle that rules of construction may not be employed where the language of the provision is clear and unambiguous.[12] "It is to be presumed that in framing the constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication ...."[13]

The language of Section 77 is clear, and its meaning unambiguous. The Governor is given authority to grant pardons. Aside from cases of impeachment, absolutely no restriction is placed on this delegation of authority. Nothing in the language of Section 77 infers that general pardons are prohibited, nor is there any indication that a governor may not pardon a class of persons. We are not at liberty to insert meaning where the language of the provision is clear. Instead, the language of Section 77 leads to only one reasonable interpretation: that the framers intended to give the Governor broad and unrestricted discretion to issue pardons to whomever.

Though not necessary because the language of Section 77 is clear, we note that our conclusion gives effect to the intent of the framers of Kentucky's constitution. A review of the debates of the constitutional convention of 1890 confirms that the delegates considered general pardons. Included in these debates is frequent reference to Governor Bramlette who, following the end of the Civil War, asked the General Assembly to pardon all Confederate soldiers.[14] The delegates also discussed the similarity of the provision to the corresponding federal provision, noting that Presidents Lincoln and Grant had wisely exercised the authority under the federal Constitution to pardon scores of former Confederate soldiers.[15] At least two delegates referenced King James II, who suspended conviction for any religious offenses in an effort to permit his fellow Catholics to practice their faith openly in Protestant England.[16] This delegate warned that an unrestricted pardoning power would permit a future governor to believe, as James II had, that "if he could pardon one individual before trial, he could pardon all individuals before trial ...."[17] Without doubt, the framers of our constitution were cognizant that the pardoning power could potentially be used to issue general pardons to persons falling within a specified class, yet declined to expressly prohibit such discretion. In light of these debates, this Court can only conclude that, if the framers sought to prohibit general pardons, they would have so stated in the

---

10. *City of Louisville Mun. Hous. Comm'n v. Pub. Hous. Admin.*, 261 S.W.2d 286, 287 (Ky. 1953).

11. *Harrod v. Hatcher*, 281 Ky. 712, 137 S.W.2d 405, 408 (1940).

12. *Grantz v. Grauman*, 302 S.W.2d 364, 366 (Ky.1957).

13. *City of Louisville v. German*, 286 Ky. 477, 150 S.W.2d 931, 935 (1940).

14. Debates, Ky. Constitutional Convention of 1890, Vol. I, p. 1116.

15. *Id.* at 1105.

16. *Id.* at 1271.

17. *Id.* at 1272.

language of the provision.[18]

 For largely similar reasons, we likewise agree with the Governor and the Court of Appeals that he is not prevented from issuing pardons prior to formal indictment for the pardoned offenses.[19] Foremost, the language of Section 77 does not restrict the pardoning power to those offenses for which an indictment has been issued. Indeed, there is no language whatsoever in Section 77 identifying a particular stage in the criminal proceedings after which a pardon is permissible. For this reason, there is simply no support in the language of the section itself for the Attorney General's proposition that pardons may only be issued for indicted offenses. And, though bearing little precedential value to our decision herein, we note that Governor Fletcher is not the first Kentucky governor attempting to issue a pardon prior to indictment, contrary to the representations of the Attorney General.[20]

The Attorney General refers extensively to the constitutional debates in urging a prohibition on pre-indictment pardons, indicating that the delegates did not specifically address such a pardon. In his dissenting opinion, Justice Cooper likewise includes numerous references to the debates in support of his proposition that the framers neither intended a pre-indictment pardon, nor even contemplated it as a real possibility. While both are correct that the pre-indictment pardon was not particularly debated at length, it is simply disingenuous to report that the framers did not consider such a pardon.

One of the most contentious and lengthy debates concerning the gubernatorial pardon focused on the issue of a pre-conviction pardon.[21] As enumerated at length in Justice Cooper's dissenting opinion, numerous amendments were proposed that would have allowed a pardon only "after conviction" or "after judgment." [22] Those seeking to restrict the pardon to post-conviction offenses relied primarily on the principle that a pardon implies that there is guilt, and should only follow a democratic society's formal indication of guilt—conviction. Such a delegation of power, it was argued, would derogate the autonomy of the judicial branch, as adequate safeguards existed within the judicial system to pro-

---

18. *Pardue v. Miller*, 306 Ky. 110, 206 S.W.2d 75, 78 (1947) (declining to interpret the phrase "public officer" as to include employees of state universities or other state employees, the Court noted that if the framers had sought to include such employees, "nothing would have been simpler than to so phrase the section as to exclude implication or speculation") (internal citations omitted).

19. We reject the Attorney General's assertion that the pardon, by its own terms, only applies to indicted individuals. The class specified in the pardon is "any and all persons who have committed, or may be accused of committing, any offense up to and including the date hereof, relating in any way to the current merit system investigation." We find no indication that the pardon was intended only for indicted, or "accused," persons. The Governor's use of the word "or" clearly intends to establish two subsets of the class of

pardoned persons: those who have committed an offense, and those who may be accused of committing an offense. "[A] pardon is to be taken most beneficially for the recipient and most strongly against the authority by which it is granted, wherever its meaning is in doubt." *Ex parte Paquette*, 112 Vt. 441, 27 A.2d 129, 131 (1942).

20. *Adkins v. Commonwealth*, 232 Ky. 312, 23 S.W.2d 277 (1929). ("Before an indictment was returned against him, on December 12, 1927, the day before his term of office expired, Governor William J. Fields issued an unconditional pardon to Adkins for this crime.")

21. *See* Debates, Vol. I, pp. 1096–1123, 1251–72.

22. *Id.* at 1123.

tect against false conviction and to protect the rights of the innocent, who need no pardon.[23] According to some, a pardon prior to conviction eroded the rights of the pardonee's victim and the public, by denying "the right to come in and have a fair investigation ... and to let the facts be submitted to a candid world." [24] Conversely, those delegates urging a broad, unrestricted pardon power argued that no distinction existed between a pre-conviction and post-conviction pardon, as the ultimate purpose of the pardon was to grant mercy in exceptional circumstances, rendering a formal conviction irrelevant: "It is not the time when the pardon is granted that is material ... [it is] that he may relieve the defendant from the penalty of the law." [25] These delegates also indicated that circumstances often necessitate an expedient pardon, one rhetorically asking whether there was a "man in this House who regrets the exercise of the Executive clemency by Governor Bramlette *before indictment,* judgment or conviction?" [26]

Through these extensive discussions wherein the delegates speculated as to the potential abuses of the gubernatorial pardon, it is evident that the framers considered a pre-indictment pardon as a valid possibility under a broadly drafted provision. This conclusion does not rest upon isolated statements of certain delegates, or upon proposed amendments that were ultimately rejected by the delegates. Rather, a genuine and comprehensive review of the entire debates makes clear that, with respect to the timing of a pardon, the primary interest of the delegates was whether a formal finding of guilt should precede a pardon. Naturally, little distinction would be drawn between a pardon prior to

indictment versus a pardon prior to conviction, as both precede a legal determination of guilt. In fact, even beyond repeated reference to Governor Bramlette's pre-indictment pardons, it was acknowledged that if pre-conviction pardons were allowed, a future governor might exercise his authority even prior to indictment. One delegate in favor of a pre-conviction pardon expressly advocated pardons prior to indictment, first reminding his colleagues that grand jury proceedings are ex parte and therefore inconsequential to a determination of guilt: "[Delegates] question the wisdom of allowing the power to pardon before conviction, and yet are willing to give the power to pardon after conviction. [They] say he shall not have the power to pardon a man from what? From a *charge* of crime. That is what he is pardoned from ...." [27] The delegates fully considered limiting pardons to post-conviction offenses, and as noted by Justice Cooper, several amendments to this effect were offered. Notwithstanding Justice Cooper's faulty analysis and summary of these debates, and the above-referenced statements of Delegate Whitaker, our conclusion remains the same: regardless of whether the delegates intended that a pre-indictment pardon would actually occur, there is simply no doubt that they recognized such a pardon as a possibility. Ultimately, the delegates of the Constitutional Convention ultimately declined to adopt *any* limitation as to when pardons could be issued. It is contrary to logic to recognize that the framers considered and rejected multiple amendments limiting the pardon power, but conclude that the framers intended that such limitations be implied nonetheless. Where no express language

**23.** *Id.* at 1113.

**24.** *Id.* at 1120–21.

**25.** *Id.* at 1099.

**26.** *Id.* at 1099 (emphasis added).

**27.** *Id.* at 1104 (emphasis added).

in Section 77 supports the proposition that pre-indictment pardons are prohibited, and the debates indicate that none was intended, this Court is without authority to interpret the provision otherwise.[28]

 Lastly, the Attorney General claims that formal acts of acceptance are essential to the effectiveness of a gubernatorial pardon, and that the Governor lacks authority to assert a pardon that has not yet been formally accepted. No Kentucky court has squarely answered this question, although the Attorney General is correct that our predecessor court has acknowledged the widely accepted, general principle that delivery and acceptance are required for a valid pardon.[29] What satisfies this acceptance requirement, however, has not been specifically defined in Kentucky.

 Other jurisdictions have addressed the acceptance requirement, and there seems to be general agreement that a pardon may be rejected or, in other words, not accepted. Where a person wishes to refuse to testify before a grand jury, claiming his Fifth Amendment privilege against self-incrimination, he may refuse to accept a presidential pardon, which would have had the unwanted effect of negating the privilege and compelling testimony.[30] Recognizing that the consequences flowing from the offense itself might sometimes be less harsh than those of a pardon, the Second Circuit has observed that the acceptance requirement is "a principle designed to protect the individual from unwanted consequences of a forced grant of … a pardon." [31] This point becomes particularly salient in the case of a conditional pardon, where the pardonee may view the conditions of pardon more loathsome than punishment for the actual offense. Thus, a pardon may not be thrust upon an unwilling recipient; it may be refused, and therefore acceptance must be a logical pre-requisite to a fully effectual pardon.

However, acknowledging that a pardon may be refused does not answer the question of what constitutes acceptance, particularly in the case of a general pardon such as here, where the pardon potentially applies to numerous, unidentified individuals. Courts have determined that delivery of the pardon to the pardonee's attorney suffices,[32] or other person acting on the pardonee's behalf.[33] These courts consider the concept of delivery and acceptance of a pardon analogous to that of a deed, so that delivery is complete when the grantor has parted with control of the document with the intention that it passes to the grantee.[34] Contrary to Justice Cooper's assertion, other courts have extended this reasoning to conclude that acceptance of a pardon is assumed, once brought to the court's attention, absent proof indicating otherwise. Over a century ago, the Supreme Court of Arkansas considered whether the testimony of a witness who had previously been pardoned should be admitted at another defendant's criminal trial; the validity of the pardon was challenged.[35] Relying

---

**28.** *Harrod,* 137 S.W.2d at 408.

**29.** *Adkins,* 23 S.W.2d at 280–81.

**30.** *Burdick v. United States,* 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915).

**31.** *Marino v. INS,* 537 F.2d 686, 693 (2nd Cir.1976).

**32.** *Ex parte Williams,* 149 N.C. 436, 63 S.E. 108 (1908).

**33.** *Ex parte Crump,* 10 Okla.Crim. 133, 135 P. 428, 431 (1913).

**34.** *Williams,* 63 S.E. at 109.

**35.** *Redd v. State,* 65 Ark. 475, 47 S.W. 119 (Ar.1898).

upon Alabama and Texas jurisprudence, the Arkansas court specifically held that "acceptance of [the pardon], we think, in the absence of any proof to the contrary, must be presumed." [36]

Upon thorough review of these cases, we agree that acceptance of a pardon need not be formal, but may be inferred by the circumstances. This position embodies the notion that a pardon may be rejected, but also the common-sense assumption that such rejection will be the rare exception. Where the circumstances of the case evidence the clear intent of the governor to issue the pardon, and there is no evidence or circumstances from which to infer that it was rejected, acceptance must be assumed. Here, the intent of the Governor to pardon any and all offenses falling within the grand jury's investigation cannot be questioned. Moreover, there is no indication that any person within its ambit has rejected the pardon. We therefore conclude that the pardon has been validly accepted.

Having determined that Governor Fletcher's pardon is valid, we now turn to the effect such pardon has on the grand jury proceedings in the Franklin Circuit Court. Governor Fletcher contends that a pardoned person cannot be validly indicted for a pardoned offense, and therefore the Franklin Circuit Court has a duty to inform the grand jury of the pardon. The Attorney General argues that, even if val-id, the pardon cannot operate to halt the grand jury proceedings.

The parties agree that a pardon serves to relieve the pardonee of criminal prosecution. "A 'pardon' is '[t]he act or an instance of officially nullifying punishment or other legal consequences of a crime.' " [37] It operates to eviscerate prosecution of the pardoned offense, because the pardonee is regarded as innocent: "The pardoned man is relieved from all the consequences which the law has annexed to the commission of the public offense of which he has been pardoned, and attains new credit and capacity, as if he had never committed that public offense." [38] However, the Governor and Attorney General disagree as to the full scope of the pardon or, more specifically, whether the pardon precludes an indictment for the pardoned offense.

The Attorney General argues that the pardon may bar punishment for the pardoned offenses, but it does not erase the fact that an offense occurred, so that the grand jury may continue to investigate and return indictments. Indeed, this Court has recognized limitations on the scope of a pardon. A pardon does not prevent any and all consequences of the pardoned offense: collateral consequences of the offense may still follow. For example, an attorney who has been pardoned for the offense of forgery may not be punished for that crime, but may be disbarred as a result of that offense.[39] Our predecessor court also recognized that a

---

**36.** *Id.,* 47 S.W. at 122. *See also Territory v. Richardson,* 9 Okla. 579, 60 P. 244, 247 (1900); *Hannicutt v. State,* 18 Tex.App. 489 (Tex.Ct.App.1885). ("We are of opinion that *the circumstances* show a delivery by the Governor and such assent on the part of the witness as amounts to a delivery and acceptance of law.") (Emphasis added). Even upon consideration of Justice Cooper's discussion of this authority, we still firmly ad-here to our interpretation of these cases and our holding herein.

**37.** *Anderson v. Commonwealth,* 107 S.W.3d 193, 196 (Ky.2003) (quoting *Black's Law Dictionary,* 7th ed.1999).

**38.** *Nelson v. Commonwealth,* 128 Ky. 779, 109 S.W. 337, 338 (1908).

**39.** *Id.*

gubernatorial pardon does not restore the character of the witness/pardonee, so that he or she could still be impeached as a felon.[40] Thus, while a pardon will foreclose punishment of the offense itself, it does not erase the fact that the offense occurred, and that fact may later be used to the pardonee's detriment.

However, the Attorney General's reliance on the theoretical underpinnings of these cases is misplaced, as they address the collateral consequences of the pardoned offense. There are no legal or semantic gymnastics by which an indictment may be characterized as a collateral consequence of an offense. It is axiomatic that grand jury investigations and indictments are stages in the criminal prosecution of the offense itself. The law is clear and well-established: "the pardon is itself an absolute exemption from any further legal proceedings ...."[41] There is no room for equivocation on this point. When a pardon has been issued, the court is without jurisdiction or constitutional authority to continue legal proceedings against the pardonee: "[w]hen a pardon ... is brought to the attention of the court, it is the duty of the court to discharge the defendant and dismiss the proceedings against him ...."[42]

We now turn to the Franklin Circuit Court's responsibility with respect to the grand jury. The grand jury has competing, but balanced, functions: on the one hand, its purpose is to investigate allegations of criminal conduct and determine if there is probable cause to believe that a crime has been committed; on the other, the grand jury serves to protect the public against unfounded criminal prosecutions where probable cause is lacking.[43] The grand jury is unique in our criminal justice system, because it operates independent of the court and the prosecutor: "[t]he hallmark of the grand jury is its independence from outside influence."[44] The Attorney General relies on the inherent independence of the grand jury to assert that the Franklin Circuit Court is without authority to instruct the jury concerning the Governor's pardon and its effect.

This position overstates the independence of the grand jury. A grand jury's authority to investigate is not without limits; for example, a grand jury may not compel a person to appear before it and testify against himself for the purpose of bringing an indictment against that person.[45] Furthermore, there are instances where judicial supervision of the grand jury's action is necessary and proper: "[a] Grand Jury is a part of the court, and under judicial control."[46] This Court has previously granted a writ of mandamus directing the circuit court to strike portions of a grand jury report that were improperly included.[47] And, more directly related to the present matter, the court is

---

**40.** *Parson v. Commonwealth,* 112 S.W. 617 (Ky.1908).

**41.** *Jackson v. Rose,* 3 S.W.2d 641, 643 (Ky. 1928). *See also Nelson,* 109 S.W. at 339. ("[T]he pardon obliterates the offense against the public ... [and] relieves the offender from the punishment affixed to it by that law ....")

**42.** *Id.*

**43.** *Bowling v. Sinnette,* 666 S.W.2d 743, 745 (Ky.1984).

**44.** *Democratic Party of Ky. v. Graham,* 976 S.W.2d 423, 426 (Ky.1998).

**45.** *Taylor v. Commonwealth,* 274 Ky. 51, 118 S.W.2d 140, 143 (1938).

**46.** *Bowling,* 666 S.W.2d at 745.

**47.** *Id. See also Matthews v. Pound,* 403 S.W.2d 7 (Ky.1966).

under a duty to instruct the grand jury concerning "any other matter affecting their rights and duties as grand jurors which the court believes will assist them in the conduct of their business." [48]

We can think of no matter that would more affect the duties of a grand jury, or would more assist it in the conduct of its business, than an instruction informing it that the very offenses which it is investigating have been pardoned, and could never be criminally prosecuted. The court must instruct a grand jury accurately of the relevant and material legal issues. An instruction informing the grand jury of the pardon's effect would in no way be encroaching on the grand jury's prerogative, simply because the grand jury no longer holds any legal prerogative to indict pardoned persons. Moreover, any person falling within the class specified by the Governor's pardon now holds a right, by virtue of the constitutional force of the pardon, to be free of any further legal proceedings. "In their proceedings the grand jurors cannot deprive a citizen of any substantial right assured by the constitution." [49] Finally, we cannot ignore certain practical concerns of the grand jurors themselves, who have sacrificed significant amounts of time in service to the public. Common sense and courtesy dictate that, where the subjects of a grand jury investigation have been pardoned and no criminal prosecution of the alleged offenses could ever result, the jurors should be so informed.

Accordingly, the Franklin Circuit Court must inform the grand jury of the legal effects of a gubernatorial pardon, and the effects it necessarily has on the present grand jury investigation. For the reasons explained herein, the grand jury must be advised that it has no authority to issue indictments against persons named in the pardon or persons falling within the class specified in the pardon. Because the Governor has conceded at oral argument that it is the prerogative of the grand jury to issue a general report of its investigation, so long as pardoned or unindicted individuals are not specifically identified, we need not address the issue. Furthermore, we note that neither this opinion, nor Governor Fletcher's pardon, has any affect whatsoever on the grand jury's investigation of post-pardon allegations of criminal conduct or an investigation of the Governor himself, who specifically and expressly excluded himself from the pardon.

We would be remiss if we failed to acknowledge the persuasive and substantial public policy concerns permeating the Attorney General's arguments herein, which would tend to favor a continued investigation by the grand jury. It has been argued that the Governor's blanket pardon of anyone committing violations of the state's merit system prior to investigation is repugnant to citizens of this Commonwealth who expect transparency in government, that it is patently offensive to those who seek open review of allegedly corrupt governmental actions, and that it erodes public confidence not only in the Governor but also the entire criminal justice system. Indeed, the framers of our constitution recognized the detrimental consequences of a pardon in certain instances: "[y]ou cannot better destroy the confidence of the people of the State in the laws and institutions of our country than to take from their midst a man who has been accused of [a] ... crime, and without a hearing so far as they are concerned, and without their

---

48. RCr 5.02.

49. *Taylor,* 118 S.W.2d at 143.

knowledge, pardon him, and he goes back a free man *without any investigation.*" [50]

In response, we must reiterate, as we have often done, the proper function of this Court. It is the duty of this Court to interpret, uphold, and apply the Constitution and laws of the Commonwealth. In this case, our sole concern must be the constitutionality—not the prudence—of the Governor's actions.[51] Where, as in Kentucky, the Governor is vested with a broad and virtually unfettered discretion to pardon, this Court is without constitutional authority to pass on the wisdom of the action, as such would be a brazen violation of the separation of powers: "[T]he courts have declined always to interfere with the executive in the exercise of the discretion vested in him by the Constitution, and a mere error of judgment, or even the grossest abuse in the exercise of his lawful authority, is not reviewable by the courts." [52] Moreover, the wisdom of Section 77 should not be questioned, simply because some may disagree with the Governor's decision. As eloquently explained by one delegate to our 1890 Constitutional Convention:

> [W]e all know, that individual isolated cases cannot determine the right or wrong of a Constitutional provision or a statutory law. I care not if the Governor made a mistake; I care not if he deliberately did a wrong; I care not if the Executives of this State, any one of them, for four consecutive years violated their oaths and committed a wrong in every act of this sort; that does not affect the right or wrong of a great Constitutional principle.

For the reasons set forth herein, we hold that the Franklin Circuit Court abused its discretion in declining to issue supplemental instructions to the grand jury. By virtue of the broad discretion afforded by Section 77 of the Kentucky Constitution, the Governor may extend general, pre-indictment pardons, and he validly did so by Executive Order 2005–924. A gubernatorial pardon operates to cease any further legal proceeding concerning the pardoned conduct, including indictments. When a grand jury is investigating alleged criminal conduct that is subsequently pardoned, it is the duty of the supervising court to instruct the grand jury of the legal effect of that pardon, as such information is relevant and material to the business of the grand jury. Accordingly, the opinion of the Court of Appeals is affirmed in part and reversed in part. Further, this matter is remanded to the Court of Appeals for entry of a writ of prohibition in conformity with this opinion.

### Appointment of Special Justices

Finally, we must address an earlier ruling relating to this case, which resulted in an Order of this Court dated March 16, 2006. Following the recusal of Chief Justice Joseph E. Lambert and Justice John C. Roach from this matter, Governor Fletcher exercised his power pursuant to Kentucky Constitution § 110(3) and appointed Special Justices Jeffrey Burdette and Ronald Green to fill the vacancies.

**50.** Debates, Vol I, p. 1110 (emphasis added).

**51.** Likewise, we are not concerned with the opinion of "dead kings of England," as is Justice Cooper. Dissenting op. at 49. These dead kings very well might turn in their graves in reaction to our opinion herein. Conversely, medieval kings would likely also be alarmed to learn that Kentucky law permits women to vote and own property, outlaws slavery, and abolishes discrimination on the basis of wealth and race. Fortunately, this Court's allegiance lies foremost with the Kentucky constitution and principles of separation of powers, not Anglo–Saxon legal tradition.

**52.** *Adkins,* 23 S.W.2d at 279.

After Special Justices Burdette and Green were sworn in, the Attorney General moved to disqualify both Special Justices. In separate written opinions, Special Justice Burdette granted the motion and recused himself from the case, while Special Justice Green denied the motion and remained on the Court. Subsequently, Governor Fletcher appointed Special Justice John Knox Mills to fill the vacancy created by Special Justice Burdette's recusal. The Attorney General thereafter filed an objection to the appointment. Following a hearing, we issued an order sustaining the Commonwealth's objection and holding the appointment of Mills null and void.

■ Pursuant to § 110(3), when "as many as two Justices decline or are unable to sit in the trial of any cause," the Constitution requires the Governor to appoint "a sufficient number of Justices to constitute a full court . . . ." As we have previously explained, "a gubernatorial appointment under this section arises from the necessity to appoint two or more special justices, the number of vacancies of two or more being the determinative factor for appointment."[53] Nonetheless, the Governor maintains that his constitutional obligation to appoint "a sufficient number of justices to constitute a full court" continues until all vacancies created by the recusal of the two regular justices are filled. Citing *Black's Law Dictionary*,[54] the Governor argues that a full court necessarily means seven justices. Thus, it is his position that he retains the power to appoint special justices until all vacancies are filled.

■ The flaw in the Governor's position is that one justice's recusal simply does not trigger § 110(3). Had one justice recused from this matter, there would have been no provision to appoint a special justice and this Court would have proceeded with six members sitting. In fact, Supreme Court Rule 1.020(1)(a) specifies how matters shall proceed in such cases: "[I]n appealed cases if one member is disqualified or does not sit and the court is equally divided, the order or judgment appealed from shall stand affirmed." Moreover, "[t]he Kentucky Constitution intentionally leaves the decision as to what should be done if only one justice disqualifies to the rule-making power of this Court."[55] While the Governor urges that this case is of such importance as to require a decision of seven justices, we would point out that we adjudicate death penalty cases with only six justices in the event of one recusal.[56] Thus, we are of the opinion that six justices constitute "a full court for the trial of the cause."[57]

We further find the Governor's reliance on *Commonwealth ex rel Revenue Cabinet v. Smith* misplaced.[58] In *Smith*, Governor Brereton Jones appointed three special justices to the Court. Thereafter, a motion to recuse the special justices was filed, which contained a separate argument that one of the special justices had individual grounds to recuse. By letter to Governor Jones, that special justice declined the appointment, prior to being sworn in, and the Governor subsequently appointed another special justice to fill the vacancy. (Execu-

---

**53.** *Commonwealth ex rel Revenue Cabinet v. Smith*, 875 S.W.2d 873, 878 (Ky.1994).

**54.** (8th ed.2004).

**55.** *Kentucky Utilities Co. v. South East Coal Co.*, 836 S.W.2d 407, 409 (Ky.1992), *cert. dismissed*, 506 U.S. 1090, 113 S.Ct. 1147, 122 L.Ed.2d 498 (1993).

**56.** *Hodge v. Commonwealth*, 17 S.W.3d 824 (Ky.1999).

**57.** Ky. Const. § 110(3).

**58.** *Id.*

tive Order 94–176, February 15, 1994). Here, however, Special Justices Burdette and Green accepted the appointments and were sworn in as special justices. Accordingly, we were a "full court" and § 110(3) was satisfied.

Therefore, we conclude that when Chief Justice Lambert and Justice Roach recused, Kentucky Constitution § 110 was properly implicated, and the Governor possessed the power to appoint two special justices. Once the appointments were made and the special justices were sworn in, § 110(3) was satisfied. The subsequent recusal of one justice simply did not trigger the Governor's power to appoint a new special justice. To permit another gubernatorial appointment would impermissibly expand the Governor's appointment power, while eroding this Court's authority to prescribe its own policies and procedures in the administration of the judicial branch.

GRAVES, J., concurs by separate opinion.

COOPER, J., concurs only as to that portion of the majority opinion entitled "Appointment of Special Justices," and dissents by separate opinion in which WINTERSHEIMER, J., joins.

SCOTT, J., concurs, but dissents as to that portion of the majority opinion entitled "Appointment of Special Justices," by separate concurring in part, dissenting in part opinion.

WINTERSHEIMER, J., concurs only as to that portion of the majority opinion entitled "Appointment of Special Justices," and dissents by separate opinion in which COOPER, J., joins.

GREEN, S.J., concurs by separate opinion in which GRAVES, J., joins, but dissents as to that portion of the majority

opinion entitled "Appointment of Special Justices," by separate opinion, in which SCOTT, J., joins.

LAMBERT, C.J.; and ROACH, J., not sitting.

Concurring opinion by Justice GRAVES.

I concur with the legal reasoning supporting the majority's opinion. I write separately to further elaborate on issues looming over, but not discussed, in the majority opinion.

Most striking to me is that this case chiefly concerns misdemeanors with a maximum penalty of six months in the county jail. Even though a grand jury empanelled by the circuit court may indict, misdemeanors cannot be tried by the circuit court, but must be transferred to the district court for trial. *Dickerson v. Commonwealth,* 174 S.W.3d 451 (Ky.2005); *Jackson v. Commonwealth,* 806 S.W.2d 643 (Ky.1991). Since prosecution of misdemeanors must commence within one year of the date of the offense, it is now likely that the Attorney General's decision to initiate grand jury proceedings will result in the dismissal of any subsequent indictment to be handed down by them not because of the Governor's pardon, but due to the expiration of the statute of limitations (KRS 500.050). To approach cases of this nature through the use of a special grand jury now appears to be a strategic error as the dismissal of any misdemeanor indictment will be compelled due to the passage of time.

Courts have defined "independent and informed" to mean the grand jury must have all relevant evidence. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Consequently, the grand jurors deserve full, complete, and accurate information regarding how the significant expenditure of their time and energy in an exhaustive investigation ef-

fects the ultimate disposition of the cases before it, that is, the cases must be dismissed.

I also believe a balanced perspective is needed as to why the pardon power can and does serve a useful and reconciliatory purpose in our constitutional framework at this time in our history.

The primary role and purpose of the executive pardon/amnesty [1] is to bring necessary balance to the severity and force of criminal law enforcement. *See Ex Parte Grossman*, 267 U.S. 87, 120, 45 S.Ct. 332, 69 L.Ed. 527 (1925). The executive's power to pardon was imported to this country from England, where the concept can be traced to the royal pardon prerogative that existed with the kings of England for centuries. Todd David Peterson, *Congressional Power Over Pardon & Amnesty: Legislative Authority in the Shadow of Presidential Prerogative*, 38 Wake Forest L.Rev. 1225, 1230 (2003). Delegates at the Constitutional Convention of 1787 insisted that the pardon power be incorporated with the executive as a necessary component of our own federal constitution. *Id.* ("[I]t is not to be doubted that a single man of prudence and good sense, is better fitted, in delicate conjunctures, to balance the motives, which may plead for and against the remission of the punishment, than any numerous body whatsoever.") (quoting *The Federalist No. 74*, at 378 (Alexander Hamilton) (Garry Wills ed., 1982)). Once called the executive's "benign prerogative of mercy," *Ex parte Garland*, 4 Wall. 333, 71 U.S. 333, 380, 18 L.Ed. 366 (1866), the pardon/amnesty power has evolved to serve as a mechanism which simultaneously checks and balances the powers of the legislature (that make the laws), the judiciary (that interprets/enforces the laws), and the grand jury/prosecutor (that investigates/prosecutes the laws). *Ex parte Grossman*, 267 U.S. at 120–121, 45 S.Ct. 332.

Amnesties/pardons granted prior to accusation or indictment are most frequently exercised as an act of political reconciliation. Throughout the history of the United States, these types of pardons were granted to rebels (Whiskey rebellion, United States Civil War), draft dodgers (by Presidents Ford and Carter after the Vietnam War), and to a fallen United States president (President Richard M. Nixon). *Guide to American Law: Everyone's Legal Encyclopedia*, Amnesty, Vol. 1 (West 1994). While these acts of reconciliation angered many at the time they were granted, they were also viewed as serving important and necessary public interests. In *Biddle v. Perovich*, 274 U.S. 480, 486, 47 S.Ct. 664, 71 L.Ed. 1161 (1927), Justice Holmes most eloquently stated:

> A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed.

In cases where the pardon power is determined by the legislature or the people to have been abused or misused [2], the coordi-

---

**1.** It has been generally understood that "[t]he distinction between amnesty and pardon is of no practical importance." *Brown v. Walker*, 161 U.S. 591, 601, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *see also Knote v. United States*, 95 U.S. 149, 152–53, 13 Ct.Cl. 517, 24 L.Ed. 442 (1877).

**2.** The statement in the dissent that the Governor's blanket pardon is merely a "scheme to cover up alleged wrongdoing in his administration" lacks a factual basis in what is acknowledged to be an abbreviated record. *Infra,* at 403. Further such statements in this context may be perceived by some as a finding of guilt which would be inconsistent with

nating checks and balances of our constitutional scheme allow resort to impeachment or deposition by popular election. *Ex parte Grossman*, 267 U.S. at 121, 45 S.Ct. 332.

In this case, the Attorney General summoned a special grand jury to investigate whether the state's merit system hiring law had been violated by the newly elected Governor. At the time the special Grand Jury was empanelled, the allegations, if true, would have constituted misdemeanor crimes. Moreover, these same incidents were (and are) simultaneously being investigated by two other agencies with subpoena powers—the Kentucky Personnel Board and the Executive Branch Ethics Commission. In light of the circumstances, the filing of a complaint and the issuance of a warrant would have served just as well for the prosecution of these alleged misdemeanors. *See Democratic Party of Kentucky v. Graham*, 976 S.W.2d 423, 427 (Ky.1998) ("an indictable offense is a felony") (interpreting Ky. Const. § 12); *see also* RCr 6.02. The cases could have been tried fairly, expeditiously, and economically as the law provides.

The Attorney General has explained that he nonetheless chose to utilize extraordinary resources and efforts to summon an investigatory grand jury in this case because the grand jury is supposedly "independent." Indeed, this Court has stated, "[t]he hallmark of the grand jury is its independence from outside influence." *Democratic Party of Kentucky*, 976 S.W.2d at 426. Yet, this case sadly demonstrates once again that the independence of our revered grand jury system is little more than convenient legal fiction. *See* Niki Kuckes, *The Useful, Dangerous Fiction of Grand Jury Independence*; 41 Am.Crim. L.Rev. 1 (2004); David A. Sklansky & Stephen C. Yeazell, *Comparative Law Without Leaving Home: What Civil Procedure Can Teach Criminal Procedure, and Vice Versa*, 94 Geo. L.J. 683, 690 (2006) ("Today everyone seems to agree that a minimally competent prosecutor can get a grand jury to 'indict a ham sandwich.' ") [3].

In Kentucky (and most states, for that matter), reality demonstrates, more often than not, that grand juries are the domain and province of the prosecutors. Not only do prosecutors initiate the proceedings, but they preside as the sole investigator, advocate, and counsel before the grand jurors during these proceedings. *See* RCr

this Court's constitutional duty to act as an independent and impartial body whose primary function is to interpret the law. While such a presumption may well seem justified from random media reports, "this Court is without constitutional authority to pass on the wisdom of the [governor's] action." Majority op., *ante*, at 365.

**3.** Contrary to the dissent's assertion, this so-called "ham sandwich" claim did not originate with the Governor (and I do not recall seeing it anywhere in his brief), but rather originated from a popular quip that has become a cynical idiom for describing the grand jury system in this country. As mentioned by Tom Wolfe in *Bonfire of the Vanities* 603 (1987), the "indict a ham sandwich" reference is attributable to former New York Chief

Judge Sol Wachtler. The phrase is also mentioned in FN8 of *United States v. Hayes*, 376 F.Supp.2d 736, 741 (E.D.Mich.2005) and FN 69 of *Improving the Quality of Justice: The Innocence Protection Act of 2004 Ensures Post–Conviction DNA Testing, Better Legal Representation, and Increased Compensation for the Wrongfully Imprisoned*, 44 Brandeis L.J. 491, (2006). In *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), Justice Douglas quoted approvingly Judge Campbell's statement that " '[a]ny experienced prosecutor will admit that he can indict anybody at anytime for almost anything before any grand jury.' " *Id.* at 23, 93 S.Ct. at 777 (quoting William J. Campbell, *Delays in Criminal Cases*, 55 F.R.D. 229, 253 (1972)) (Justice Douglas, dissenting).

5.06, RCr 5.14 (prosecutors may attend grand jury proceedings, may subpoena and examine witnesses, and give grand jurors legal advice "regarding any matter cognizable by them."). No judge presides at grand jury proceedings and defendants have no right to present anything before the grand jury (or be present at the proceedings). RCr 5.08 and RCr 5.18.

Neither statute, decision, nor rule permits the grand jury to obtain outside investigatory assistance; it depends solely on the prosecuting attorney. The grand jury remains an appendage of the trial court, powerless to perform its investigative function without the trial court's aid. It is the trial court's process which summons the witness to attend and give testimony, and it is the trial court that must compel a witness to testify. The trial court may quash a grand jury subpoena if it infringes upon a vested right. Thus, the scope and direction of any grand jury proceeding is largely (if not exclusively) in the hands of the public prosecutor (and to some extent the trial court)[4]. Often the so-called grand jury investigation is really nothing more than a review of the prosecutor's predigested evidence and a ratification of his conclusion.

Of course, grand juries certainly did not originate as the mere strong arm of public prosecutors. Rather, the institution evolved as an important and independent body of citizens determined to ferret out crime and governmental abuses, as well as protect the individual from unfair governmental oppression. *See, e.g.,* Susan M. Schiappa, *Preserving the Autonomy and Function of the Grand Jury: United States v. Williams,* 43 Cath.U.L.Rev. 311 (1993); Lewis Poindexter Watts, Jr., *Grand Jury: Sleeping Watchdog or Expensive Antique,* 37 N.C.L.Rev. 290 (1958–59). "Well into the nineteenth century, in both England and America, the apprehension of offenders and prosecution of criminal cases was a private affair, in which government participated only by offering rewards." Sklansky and Yeazell, *supra,* at 691. In a world of private law enforcement, the grand jury was a useful and vital institution, serving to investigate complaints and to screen out those which were determined to be unfounded or without merit. *Id.* at 690.

By the late nineteenth century, however, public police and prosecutorial departments greatly expanded their scope and expertise in investigation and prosecution. *Id.* at 691. Eventually, grand juries were no longer needed to spearhead investigations or sort through citizen complaints. An extensive movement for legal reform materialized in the 1920's and early 1930's, advocating for the United States to follow the lead of our mother country, England, and abolish the antiquated institution.

---

4. Ironically, the dissent actually illustrates *this point by demonstrating the grand jury's* utter dependence on the trial court's instructions to it. First, the dissent speculates that the scope of the grand jury's investigation was directed and defined by the trial court (and not the grand jury, as it once was). *Infra,* at 372 ("Although the trial court's charge to the grand jurors is not found in this abbreviated record, the charge presumably directed them to inquire into the allegations of merit system violations and to find an indictment where they have received what they believe to be sufficient evidence to support it, i.e., probable cause."). Next, the dissent describes how the grand jurors actually inquired about the effect, if any, the Governor's pardon had on their work. The trial court responded that the pardon had no effect on their work whatsoever and that at such time as the court determined that the pardon did effect its work, it would so advise. *Infra,* at 373. Thus, the jurors were essentially being directed as to how they should proceed. In the face of such stature and authority, could any reasonable citizen truly feel empowered (or even justified) to question the trial court?

Watts, *supra*, at 290. Famous judges Roscoe Pound and Felix Frankfurter opined that grand juries were inefficient and unnecessary, since police, prosecutors, and trial courts had already absorbed the functions once embraced by grand juries. Richard D. Younger, *The Grand Jury Under Attack, III*, 46 J.Crim. L. Criminology & Police Sci. 214, 215 (1955–56).

Unfortunately, the grand jury today has evolved to be but a shadow of its former self. Grand juries are largely passive bodies, utterly dependent upon the prosecutor and the trial court for information and evidence. There seem to be several reasons for this. First, laws and crimes today are increasingly complex and technical. Citizens without legal training are incredibly vulnerable to becoming complacent with the recommendations and urgings of a prosecutor who is cloaked with the title of being their "legal advisor." RCr 5.14; *see also*, Schiappa, *supra*, at 334–35. Unlike past centuries, grand jurors have no personal knowledge or ability to investigate cases on their own, but must wait for the prosecutor to bring them cases and feed them information at his or her sole discretion and will. Schiappa, *supra* at *Id.* Also, since grand jury proceedings are *ex parte*, prosecutors may question and subpoena witnesses and documents without any scrutiny from judges or adversaries, and thus, slant or portray the evidence as they deem fit. Krukes, *supra* at 3–4. When all these factors and circumstances are considered in their totality, motivated and well-meaning citizens have but little chance to take control of their own institution.

Thus, when the reality of the situation is truly considered (and not the legal fiction which has been fervently portrayed by this Court and others), the Attorney General's claim that he summoned this grand jury to serve as an independent adjudicator of probable cause is, at best, unrealistic, and at worst, disingenuous. Cutting through the fog of rhetoric and setting aside the legal fictions compel the rational conclusion that this case indeed demonstrates the continued relevancy and reconciliatory purpose of executive pardons in a republic, notwithstanding polarizing polemics and unyielding arguments to the contrary.

Ultimately, if grand jury independence is to have any meaning whatsoever, then there can be no conclusion other than the one reached by this majority—a fully informed grand jury is paramount to ensuring (or perhaps encouraging) an independent grand jury. These reasons, coupled with the majority's otherwise sound analysis, compel me to concur with the majority's opinion.

Dissenting in part opinion by Justice COOPER.

I concur with that portion of the majority opinion entitled "Appointment of Special Justices," *ante*, at 365–66. From the remainder of the majority opinion, I strongly dissent.[1]

## I. FACTS.

The provisions of Kentucky's "merit system" statutes that are pertinent to this case are:

KRS 18A.095. Rights of executive department employees.

. . . .

(2) A classified employee with status shall not be dismissed, demoted, suspended, or otherwise penalized except for cause.

. . . .

---

1. Since each Member of the Court has written a separate opinion, any reference herein to another opinion will identify the opinion by its author.

KRS 18A.111. Probationary periods for classified service—Initial and promotional.

. . . .

(2) An employee who satisfactorily completes the initial probationary period for the position to which he was initially appointed to the classified service shall be granted status and may not be demoted, disciplined, dismissed, or otherwise penalized, except as provided by the provisions of this chapter.

. . . .

KRS 18A.140. Prohibition against discrimination and political activities.

(1) No person shall be appointed or promoted to, or demoted or dismissed from, any position in the classified service, or in any way favored or discriminated against with respect to employment in the classified services because of his political or religious opinions or affiliations or ethnic origin or sex or disability. . . .

. . . .

KRS 18A.990. Penalties.

(1) Any person who willfully violates any provision of KRS 18A.005 to 18A.200 or of the rules shall be guilty of a misdemeanor, and shall upon conviction be punished therefor with a sentence of from thirty (30) days to a maximum of six (6) months in jail.

(2) Any person who is convicted of a misdemeanor under KRS 18A.005 to 18A.200 shall, for a period of five (5) years, be ineligible for appointment to or employment in a position by the Commonwealth, and if he is an officer or employee of the Commonwealth, shall forfeit his office or position.

. . . .

Since the misdemeanor penalty in KRS 18A.990(1) can be probated or conditionally discharged, it is the forfeiture-of-office penalties in KRS 18A.990(2) that are of primary concern to an offending bureaucrat.

In May 2005, a thirty-year employee of the Kentucky Transportation Cabinet delivered to the Attorney General of Kentucky a document, consisting of approximately 300 pages, alleging violations of the merit system statutes by Transportation Cabinet supervisors and other high-ranking officials of the administration of Governor Ernie Fletcher. The gist of the allegations was a conspiracy to terminate or force resignations[2] of merit system employees who were registered Democrats and replace them with persons who were registered Republicans.

The Franklin Circuit Court empaneled a special grand jury to investigate the allegations. KRS 29A.220; Order, Misc. No. 28, Franklin Circuit Court, May 25, 2005.[3] Although the court's charge to the grand jurors is not found in this abbreviated record, the charge presumably directed them to inquire into the allegations of merit system violations and to "find an indictment where they have received what they believe to be sufficient evidence to support it," i.e., probable cause. RCr 5.10 ("Evidence supporting indictment"). Note that RCr 5.10 does not preclude the return of indictments for pardoned offenses—no

2. E.g., by transferring the targeted employees to new workplaces great distances from their homes and families.

3. Contrary to the assertion in JUSTICE GRAVES's opinion, the Attorney General did not "initiate" the grand jury proceedings. He filed a motion that a special grand jury be empaneled to investigate the allegations of merit system violations. The Franklin Circuit Court granted the motion and initiated the proceedings by empaneling the special grand jury.

doubt because, until today, no one ever assumed that a pardon could be granted for an uncharged offense.

During the period from May 25 to August 29, 2005, the special grand jury returned indictments against James L. Adams, Darrell D. Brock, Jr., Danny G. Druen, Tim Hazlette, Charles W. Nighbert, Cory W. Meadows, Richard L. Murgatroyd, Basil W. Turbyfill, and Robert W. Wilson, Jr., all officers or employees of the Commonwealth, charging them with violations of the merit system statutes. Most, if not all, of the indictees were afforded the opportunity (subpoenaed) to appear before the grand jury before indictment to explain or deny the allegations against them. According to statements attributed to their attorneys, most, if not all, declined the invitation by invoking the privilege against self-incrimination. U.S. Const. amend. V; Ky. Const. § 11.

On August 5, 2005, Governor Fletcher advised the press that his office was engaged in "high-level discussions" about possible pardons for the indictees, but that such was only "hypothetical" at that time. Ryan Alessi & Jack Brammer, *Fletcher Pardon Talks "Hypothetical"*, Lexington Herald–Leader, Aug. 6, 2005, at A1. One indictee, Nighbert, who was then acting as Transportation Cabinet Secretary (and has since been promoted by Governor Fletcher to permanent Transportation Cabinet Secretary), was quoted as saying that he would decline a pardon because he wanted to "prove my innocence in court." *Id.* However, on August 29, 2005, Nighbert executed the following document, which is on file in the office of the Secretary of State:

### APPLICATION FOR PARDONS

I, Charles W. "Bill" Nighbert personally and in my official capacity as Acting Secretary of the Kentucky Transporta-

tion Cabinet, hereby request the exercise of the gubernatorial power of pardon as to myself, James L. Adams, Darrell D. Brock, Jr., Danny G. Druen, Tim Hazlette, Cory W. Meadows, Richard L. Murgatroyd, Basil W. Turbyfill, Robert W. Wilson, Jr., and any and all persons who have committed or may be accused of committing, any offense arising from or relating to the current state merit system investigation being conducted by the special grand jury presently sitting in Franklin County, Kentucky and the Office of the Attorney General, including but not limited to KRS Chapter 18A and provisions of the Kentucky Penal Code.

/s/_____

CHARLES W. "BILL" NIGHBERT

08/29/05___

Date

On that same date, Governor Fletcher executed Executive Order No.2005–924, also on file with the Secretary of State, which reads as follows:

### PARDONS

### TO WHOM IT MAY CONCERN

WHEREAS, on May 25, 2005, the Franklin Circuit Court ordered the empanelment of a special grand jury to investigate merit system employee hiring in the Kentucky Transportation Cabinet; and

WHEREAS, the merit system law has not been materially or significantly changed since its original enactment in 1960; and

WHEREAS, the dispute arising out of these matters is one of public policy

which is better addressed in the political arena, and not the courts;[4] and

WHEREAS, the best means of correcting any deficiencies in the state merit system is through the legislative and administrative process; and

WHEREAS, other proper and legal means exist to fully investigate any allegations relating to employment decisions, and to provide redress to any Kentuckian who believes that a mistake may have been made in an individual circumstance; and

WHEREAS, the continuation of criminal proceedings sought by the Attorney General would have no effect on the circumstances of any individual who may have been excluded from employment;[5] and

WHEREAS, Section 77 of the Constitution of Kentucky grants authority to the Governor of the Commonwealth of Kentucky "to remit fines and forfeitures, commute sentences, grant reprieves and pardons"; and

WHEREAS, in all aspects of my life I have been guided by a desire for justice and basic human decency, and by these actions that I take today, I believe that justice will be served.

NOW, THEREFORE, in consideration of the foregoing, and by virtue of the authority vested in me by Section 77 and related provision in the Constitution of the Commonwealth of Kentucky, I, ERNIE FLETCHER, Governor of the Commonwealth of Kentucky, do hereby grant a full, complete, and unconditional pardon to James L. Adams, Darrell D. Brock, Jr., Danny G. Druen, Tim Hazlette, Charles W. Nighbert, Cory W. Meadows, Richard L. Murgatroyd, Basil W. Turbyfill, Robert W. Wilson, Jr., and any and all persons who have committed, or may be accused of committing, any offense up to and including the date hereof, relating in any way to the current merit system investigation being conducted by the special grand jury presently sitting in Franklin County, Kentucky and the Office of the Attorney General, including but not limited to any violation of KRS Chapter 18A, all statutes within the Kentucky Penal Code, and in particular KRS 18A.095, KRS 18A.111, KRS 18A.140, KRS 18A.990, KRS 522.020,[6] KRS 502.020,[7] KRS 506.030,[8] KRS 506.040,[9] KRS 506.070,[10]

4. This language is virtually identical to that used by President George H.W. Bush in his "Christmas Eve pardons" of former Secretary of Defense Caspar Weinberger, Assistant Secretary of State Elliott Abrams, former National Security Advisor Robert McFarlane, and three former Central Intelligence Agency officials (Duane Clarridge, Alan Fiers, and Clair George), all of whom had been indicted as participants in the so-called "Iran–Contra scandal":

The prosecutions of the individuals I am pardoning represent what I believe is a profoundly troubling development in the political and legal climate of our country: the criminalization of policy differences. These differences should be addressed in the political arena . . . .

Proclamation No. 6518, 57 Fed.Reg. 62, 145 (Dec. 24, 1992).

5. Presumably, the same reasoning could be used to justify the pardon of a murderer, i.e., punishing the killer will not return the victim to life.

6. Official misconduct in the first degree.

7. Complicity.

8. Criminal solicitation.

9. Criminal conspiracy.

10. Incapacity of solicitee or co-conspirator. See id. (The fact that solicitee could not be guilty of crime solicited because of, e.g., criminal irresponsibility or unawareness of criminal nature of conduct, is no defense).

KRS 506.080,[11] KRS 524.050,[12] or KRS 524.100.[13] The provisions of this Order shall not apply to Ernie Fletcher, Governor of the Commonwealth of Kentucky.[14]

/s/_____

ERNIE FLETCHER, Governor

Commonwealth of Kentucky

/s/_____

TREY GRAYSON

Secretary of State

In a press release accompanying the pardons, the Governor characterized violations of the merit system statutes as "the equivalent of conspiring to commit noodling out of season."[15] Press Release, Governor Ernie Fletcher's Commc'n Office, Governor challenges Attorney General to join him in moving Kentucky forward (Aug. 29, 2005).

Indictee Brock and attorneys representing three other indictees subsequently advised members of the press that they had not requested pardons. Associated Press, *Resistance to Pardons Gives Way to Thanks for Fletcher's "Courage"*, Lexington Herald–Leader, Sept. 1, 2005, at B3.

On August 30, 2005, Governor Fletcher appeared before the grand jury in response to a subpoena, stated his name, address, and position of employment, then invoked his constitutional privilege against self-incrimination. Jack Brammer & Ryan Alessi, *Fletcher takes Fifth with Grand Jury*, Lexington Herald–Leader, Aug. 31, 2005, at A1.

On September 30, 2005, the grand jury returned indictments against Daniel Groves and Vincent Fields for violations of the merit system statutes. On October 20, 2005, the grand jury returned indictments against David Disponett and J. Marshall Hughes for violations of the merit system statutes.[16] There is no evidence that any of the indictees ever formally accepted the purported pardons.

On October 24, 2005, the Governor filed a motion that the Franklin Circuit Court instruct the special grand jury that (1) the "amnesty" granted by the Governor pardons every individual within the class of persons described in the Executive Order, whether or not the person is named in the Order and whether or not that person was

11. Criminal facilitation.

12. Tampering with witness.

13. Tampering with physical evidence.

14. Whether a Chief Executive can pardon him/herself has never been decided as such has never been attempted. *Compare* Robert Nida & Rebecca L. Spiro, *The President as His Own Judge and Jury: A Legal Analysis of the Presidential Self–Pardon Power*, 52 Okla. L.Rev. 197 (1999) *with* Brian C. Kalt, Note, *Pardon Me?: The Constitutional Case Against Presidential Self–Pardons*, 106 Yale L.J. 779 (1996).

15. "Noodling" is the sport of catching rough fish, *e.g.*, catfish, with one's bare hands, arguably easier than luring the fish to take one's bait. The noodling season is from June 1 to August 31. 301 KAR 1:075(6). Presumably, the Governor's comparison of illegally terminating a classified employee to illegally fishing out of season derived from the classification of both offenses as Class A misdemeanors, *see* KRS 150.305(1); KRS 150.990(6), and not because he believes that fishing out-of-season is as serious an infraction as illegally terminating the employment (including health care benefits and, possibly, retirement benefits) of a citizen of the Commonwealth on the basis of his or her political affiliation.

16. On May 11, 2006, during the pendency of this appeal, the grand jury returned an indictment against Governor Fletcher, charging him with three Class A misdemeanors: two violations of the merit system statutes, and official misconduct, KRS 522.020. Franklin Dist. Ct. Case No. 06–M–812 (May 11, 2006). *See also*, Tom Loftus & Mark Pitsch, *Fletcher Indicted*, The Courier–Journal, May 12, 2006, at A1.

indicted prior to the issuance of the pardon; (2) the individuals within the class of persons covered by the "amnesty" have been fully and unconditionally pardoned, whether or not they have formally accepted the pardon; (3) the grand jury may not indict pardoned persons solely for the purposes of naming them in a report; (4) the pardon legally "obliterates" the offense, so pardoned conduct that preceded the pardon is no longer an indictable offense and, therefore, cannot constitutionally form the basis for an indictment; and (5) the grand jury may not issue a general report discussing the testimony or other evidence presented to it. In other words, the grand jury may continue to investigate the allegations of merit system violations *ad infinitum*, but may never reveal the identities of the persons found to have committed any violations. Presumably, the report could refer to these unidentified perpetrators as, *e.g.*, "Unindicted Co-conspirator No. 1," etc.

The Franklin Circuit Court correctly declined the invitation to hamstring the grand jury's investigation by permitting the Governor to use his pardoning power to cover up alleged wrongdoing by members of his administration. It did, however, dismiss the indictments, some on motions of the indictees, others *sua sponte*. The Court of Appeals correctly denied the Governor's petition for a writ of mandamus, CR 76.36(1), which sought to force the Franklin Circuit Court to instruct the grand jury pursuant to his requests. The Governor then appealed the denial of the writ to this Court as a matter of right. Ky. Const. § 115; CR 76.36(7)(a). Remarkably, a majority of this Court now holds that the grand jury "must be advised that it has no authority to issue indictments against persons named in the pardon or persons falling within the class specified in the pardon." JUSTICE JOHNSTONE's lead opinion apparently would also hold that the grand jury's final report may not identify pardoned or unindicted individuals. *Ante*, at 364.[17] I dissent from these holdings because:

(1) A pardon does not "obliterate" either an indictment or guilt, but only relieves the pardonee of the criminal consequences of his offense;

(2) The requirement that a pardon be accepted requires some overt act of acceptance and is not presumed from a mere failure to reject;

(3) Section 77 of the Constitution of Kentucky does not authorize a Governor to issue pre-indictment pardons;

(4) Section 77 requires that a pardon be premised upon a personal application therefor, and only one of the pardoned defendants, Nighbert, personally applied for a pardon;

(5) The application requirement precludes the issuance of "blanket pardons" of unidentified perpetrators of unidentified offenses;

(6) This particular pardon is invalid in part because it purported to pardon persons not yet indicted and persons who have never applied for a pardon, and under Kentucky law, a pardon that is invalid in part is invalid *in toto*;

(7) Grand jury investigations are not "legal proceedings," but only the precursors of legal proceedings, which are com-

---

**17.** In his separate opinion, JUSTICE SCOTT agrees (though with different reasoning) that the special grand jury can identify alleged perpetrators in its report. Thus, on that point, the holdings of the Franklin Circuit Court and the Court of Appeals are affirmed. SCR 1.020(1)(a) ("[I]f one member is disqualified or does not sit and the court is equally divided, the order or judgment appealed from shall stand affirmed.").

menced by a formal accusation or charge, *e.g.*, the return of an indictment; and

(8) A grand jury report can name persons accused of criminal conduct so long as the grand jury specifies that there is probable cause to believe that such person engaged in that conduct.

## II. PARDONS.

We begin with the proposition that, in a republic, the power to pardon is not an inherent power of the executive. The power is in the people who delegate it to the executive by way of constitutional provision and who may attach conditions to its exercise. *Moore v. City of Newport*, 198 Ky. 118, 248 S.W. 837, 838 (1923). *See also Laird v. Sims*, 16 Ariz. 521, 147 P. 738, 738 (1915); *State v. Dunning*, 9 Ind. 20, 23 (1857); *Jamison v. Flanner*, 116 Kan. 624, 228 P. 82, 87 (1924).

Article II, section 2, clause 1, of the United States Constitution, dealing with the powers and duties of the President, closes with these words:

[A]nd he shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.

Thus, there are no stated conditions or restrictions on the president's pardoning power except that the power may not be used to prevent an impeachment. The genesis of this exception was the case of the Earl of Danby, Treasurer of England, who was impeached in 1678 for offering neutrality to France in exchange for substantial payment in direct contravention of Parliament's desire to raise funds for a war against France. During the course of the impeachment proceedings, Charles II pardoned Danby for the offense, thus precluding the impeachment (and the introduction of any evidence that the King may have been complicit in Danby's act). Nida & Spiro, *supra* note 14, at 203–04; Hugh

C. Macgill, *The Nixon Pardon: Limits on Benign Prerogative*, 7 Conn. L.Rev. 56, 61 (1974) ("[T]he genesis of the exception was the Danby problem, the use of a pardon to block legislative investigation of executive misconduct by means of impeachment."). Resultantly, Parliament provided in the Act of Settlement, 12 & 13 Will. III, ch. 2, § 3 (1700), that a royal pardon could not be pleaded in bar of impeachment. Macgill, *supra*, at 58 & n. 14. In light of the facts of this case, it is pertinent to note Justice Story's explanation for the impeachment exception:

The power of impeachment will generally be applied to persons holding high offices under the government; and it is of great consequence that the President should not have the power of preventing a thorough investigation of their conduct, or of securing them against the disgrace of a public conviction by impeachment, if they should deserve it. The Constitution has, therefore, wisely interposed this check upon his power, so that he cannot, by any corrupt coalition with favourites, or dependents in high offices, screen them from punishment.

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1495 (1833).

Indeed, the chief objection to conferring the pardoning power on the president was the fear that the president might use that authority to shield the president's confederates in treason. *The Federalist No. 74*, at 408–09 (Alexander Hamilton) (E.H. Scott ed. 1898); W.H. Humbert, *The Pardoning Power of Presidents* 18 (1941). Some foreign governments, even some that could hardly be described as republican in nature, have adopted constitutions that specifically preclude the head of state from pardoning his own ministers. Constitution of the Kingdom of Belgium, art. 73 (1831) ("[The King] shall have the right to remit

or to reduce the sentences pronounced by the judges, save those who are decreed regarding the ministers."); Constitution of the Kingdom of Prussia, art. 49 (1850) ("The King shall have power to pardon, and to mitigate punishment. But in favor of a minister condemned for his official acts, this right can only be exercised on the motion of that Chamber whence his impeachment emanated. Only in virtue of a special law can the King suppress inquiries already instituted."); Constitution of the United States of Brazil, art. 48, § 6 (1889) ("to pardon and commute penalties in cases of crimes subject to federal jurisdiction, except cases of impeachment and crimes committed by ministers of state").

As we learned from President George H.W. Bush's pardons of the Iran–Contra indictees, *supra* note 3, the fears of the critics of the pardoning power were ultimately realized. In fact, some commentators have speculated that the real motive for the Iran–Contra pardons was, as in Danby's case, to cover up the president's own complicity. Peter M. Shane, *Presidents, Pardons, and Prosecutors: Legal Accountability and the Separation of Powers*, 11 Yale L. & Pol'y Rev. 361, 403–04 (1993) (suggesting that the Bush pardons involved an attempt by the President to cover up his own questionable activities); Harold Hongju Koh,[18] *Begging Bush's Pardon*, 29 Hous. L.Rev. 889, 889–90 (1992) ("Thus, for Bush, like the defendants he pardoned, the issue was ... whether he had himself partaken in the manifest abuse of constitutional authority that this affair represented."); James N. Jorgensen, Note, *Federal Executive Clemency Power: The President's Prerogative to Escape Accountability*, 27 U. Rich. L.Rev. 345, 346 (1993) ("For perhaps the first time in United States history, an executive pardon may have been motivated by the self-interest of a president who halted criminal proceedings in order to suppress information concerning his own conduct.").

The United States Supreme Court first interpreted the pardoning power granted by Article II in *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 8 L.Ed. 640 (1833). In that opinion, Chief Justice Marshall established four principles with respect to the operation and effect of a presidential pardon: (1) a pardon exempts the person upon whom it is bestowed from *punishment* for the crime pardoned; (2) a pardon is of no effect unless it is *accepted* by the person pardoned and (3) *brought to the attention of the court* in which it is sought to be enforced; and (4) a pardon is *subject to judicial review and interpretation*.

> A pardon is an act of grace, proceeding from the power intrusted [sic] with the execution of the laws, which exempts the individual on whom it is bestowed, from the *punishment* the law inflicts for a crime he has committed; it is the private, though official act of the executive magistrate, delivered to the individual for whose benefit it is intended, *and not communicated officially to the court*.

> It is a constituent part of the judicial system, that the judge sees only with judicial eyes, and knows nothing respecting any particular case of which he is not informed judicially; a private deed, not communicated to him, whatever may be its character, whether a pardon or release, is totally unknown, and cannot be acted upon....

> ... A pardon is a deed to the validity of which delivery is essential, and delivery is not complete without *acceptance*; it may then be rejected by the person to whom it is tendered; and if it be reject-

18. Dean Koh is the current dean of Yale Law School.

ed, we have discovered no power in a court to force it to him.

It may be supposed, that no being condemned to death would reject a pardon; but the rule must be the same in capital case and in misdemeanors. . . .

[The pardon] may be absolute or conditional; it may be *controverted by the prosecutor*, and must be *expounded by the court*. These circumstances combine to show, that this, like any other deed, ought to be brought judicially before the court, by plea, motion or otherwise.

*Id.* at 160–61 (emphasis added) (footnotes and quotations omitted).[19]

### A. Punishment.

*Poena tolli potest, culpa perennis erit* (The punishment can be removed, but the crime remains).

*United States v. Noonan*, 906 F.2d 952, 960 (3d Cir.1990).

The Governor's primary assertion, and one that the majority of this Court erroneously adopts, is that the grand jury cannot issue indictments because "the pardoned conduct no longer constitutes a criminal offense," Appellant's brief, at 18, *i.e.*, it has been "obliterated." *See* Governor's requested instruction to the special grand jury No. 4, *supra*. The Governor grounds this position on dictum in *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866), that "when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence." *Id.* at 380, 18 L.Ed. 366. However, the "blots out" statement was directly contradicted

by a later statement in *Burdick v. United States*, 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), that a pardon "carries the imputation of guilt; acceptance a confession of it." *Id.* at 94, 35 S.Ct. at 270. *See Bjerkan v. United States*, 529 F.2d 125, 128 n. 2 (7th Cir.1975) (noting *Burdick*'s departure from the *Garland* dictum). In fact, the holding in *Garland* was that refusal to permit the pardoned attorney to practice law before the Supreme Court (the only issue in *Garland*) would impermissibly punish him for the pardoned offense (joining the Confederacy), not that the offense had been "blotted out." *In re North*, 62 F.3d 1434, 1437 (D.C.Cir.1994). *Garland* decided only that:

The effect of this pardon is to relieve the petitioner from all *penalties and disabilities* attached to the offence of treason, committed by his participation in the Rebellion. So far as that offence is concerned, *he is thus placed beyond the reach of punishment* of any kind.

*Garland*, 71 U.S. at 381, 18 L.Ed. 366 (emphasis added). *See also Noonan*, 906 F.2d at 958 (characterizing *Garland*'s "blots out" statement as dictum rejected by *Burdick*). Other courts have characterized the "blots out" statement as mere metaphor. *In re Abrams*, 689 A.2d 6, 19 (D.C.1997) ("[B]ut metaphors cannot appropriately be used to justify a conclusion which would follow logically only if the metaphor were not a figure of speech but an accurate description."); *People ex rel. Prisament v. Brophy*, 287 N.Y. 132, 38 N.E.2d 468, 470 (1941) (same).

A law review article authored by Professor Williston put the *Garland* dictum to rest, concluding:

**19.** Although SPECIAL JUSTICE GREEN's opinion argues that "acceptance" was not at issue in *Wilson, ante*, at 378, Chief Justice Marshall's opinion recites that the accused "waived and declined any advantage or protection which might be supposed to arise

from the pardon," 32 U.S. at 158, 8 L.Ed. 640 and that "he did not wish in any manner to avail himself, in order to avoid the sentence in this particular case, of the pardon referred to." *Id.* at 158–59, 8 L.Ed. 640.

Thus, the fact of conviction after a pardon cannot be taken into account in subsequent proceedings. *However, the fact of the commission of the crime may be considered.* Therefore, although the effects of the *commission of the offense* linger after a pardon, the effects of the *conviction* are all but wiped out.

Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 Harv. L.Rev. 648, 653 (1915) (emphasis added). "The fundamental distinction suggested by Professor Williston has been generally accepted and followed by the courts since the date of his article." *Damiano v. Burge*, 481 S.W.2d 562, 565 (Mo.Ct.App.1972). "The parties have not cited, and our research has not disclosed, a single decision by any federal, state, or other court . . . which has rejected Professor Williston's reasoning." *Abrams*, 689 A.2d at 11. Until today.

In *Noonan*, the Third Circuit canvassed cases from the British Commonwealth (the origin of the pardoning power in United States jurisprudence) and determined that English law also holds that a pardon does not "blot out" guilt. 906 F.2d at 959–60. *See, e.g., R. v. Foster*, (1985) 1 QB 115, 129 ("[The effect of the pardon] was to remove the criminal element of the offense named in the pardon, but not to create any factual fiction, or to raise the inference that the person pardoned had not in fact committed the crime for which the pardon was granted."). A pardon "neither takes away the guilt [n]or washes out the moral stain." *Anglea v. Commonwealth*, 51 Va. (10 Gratt.) 696, 1853 WL 3250, at *4 (1853). It "secures against the consequences of one's acts, and not against the acts themselves; it involves forgiveness, not forgetfulness." *United States v. Swift*, 186 F. 1002, 1017 (N.D.Ill.1911). For the same reasons, a pardon does not "blot out" the existence of an indictment. *North*, 62 F.3d at 1437.

Our own cases are in accord.

But it cannot wipe out the act that he did, which was adjudged an offense. It was done, and will remain a fact for all time. Notwithstanding the extensive language used in *Ex parte Garland, supra,* and *In re Deming, supra,* [10 Johns. 232] and that which we have used, there are limits to the effect of such a pardon.

*Nelson v. Commonwealth*, 128 Ky. 779, 109 S.W. 337, 338 (1909) (quotation omitted). Thus, while a pardoned offense may not be punished, such does not preclude an accusation that the offense was committed—and the admission of guilt that flows from the acceptance and assertion of the pardon. *See also Parson v. Commonwealth*, 112 S.W. 617, 617 (Ky.1908) ("The pardon of the Governor did not restore the character of the witness in so far as it was besmirched by the commission of the felony of which he was convicted.").

### B. Acceptance.

In upholding the validity of a conditional pardon, it was said in *Ex parte Wells*, 59 U.S. (18 How.) 307, 15 L.Ed. 421 (1855):

[I]f the condition upon which alone the pardon was granted be void, the pardon must also be void. If the condition were lawful, but the prisoner did not assent to it, . . . he cannot have the benefit of the pardon . . . .

*Id.* at 312, 15 L.Ed. 421. In *Burdick v. United States*, the United States Supreme Court again reaffirmed the requirement of acceptance, explaining that since a pardon "carries the imputation of guilt; acceptance a confession of it," 236 U.S. at 94, 35 S.Ct. at 270, one to whom a pardon is offered may prefer to maintain his innocence and reject the "escape by confession of guilt implied in the acceptance of a

pardon." *Id.* at 90–91, 35 S.Ct. at 269.[20] *See also State v. Jacobson,* 348 Mo. 258, 152 S.W.2d 1061, 1063 (1941) ("[A]s the very essence of a pardon is forgiveness or remission of penalty, a pardon implies guilt." (Citations and quotations omitted.)); *Cook v. Bd. of Chosen Freeholders,* 26 N.J.L. 326, at *4 (N.J.1857) ("Pardon implies guilt. If there be no guilt there is no ground for forgiveness. It is an appeal to executive clemency. It is asked as a matter of favor to the guilty. It is granted not of right but of grace. A party is acquitted on the ground of innocence; he is pardoned through favor."). It is this admission of guilt and its attendant opprobrium that underlies the requirement of acceptance and belies the holding of JUSTICE JOHNSTONE's opinion that accep-

tance is presumed from the absence of rejection.[21]

An unsolicited pardon or amnesty issued by the executive does not become effective automatically. It must be accepted by the one to whom it is issued before it can operate as a waiver of his right to contest his guilt.

*Marino v. I.N.S.,* 537 F.2d 686, 692 (2d Cir.1976). Another reason for requiring acceptance is that it estops the person pardoned from later asserting that a condition attached to the pardon is invalid. *Schick v. Reed,* 419 U.S. 256, 267, 95 S.Ct. 379, 385, 42 L.Ed.2d 430 (1974) ("It would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily as-

**20.** SPECIAL JUSTICE GREEN's opinion posits that *Wilson* and *Burdick* were effectively overruled by *Biddle v. Perovich,* 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927). *Ante,* at 411. *Biddle* was a Certified Question of Law from the Eighth Circuit Court of Appeals, *viz.,* whether the President could commute the death sentence of a convicted murderer to life in prison. The prisoner claimed the imposition of the life sentence was without his consent, thus the commutation should be construed as a full pardon. *Id.* at 485, 47 S.Ct. at 665. However, *Biddle* did not implicate the presumption of innocence (because the prisoner had already been convicted prior to the commutation) and should more likely be characterized as a departure from the statement in *Ex parte Wells* that rejection of the condition nullifies the pardon. The following language from *Biddle* flatly refutes the Special Justice's claim: "We are of the opinion that the reasoning of *Burdick v. United States* is not to be *extended* to the present case." *Id.* at 488, 47 S.Ct. at 666 (emphasis added) (citation omitted). To decline to "extend" implies the continued validity of *Burdick*'s holding.

Although the Special Justice correctly notes that the U.S. Supreme Court has not cited *Burdick* in a majority opinion since *Biddle,* *Burdick* has been cited in a concurring opinion for the proposition that a pardon requires acceptance. *Nixon v. Adm'r of Gen. Servs.,*

433 U.S. 425, 486, 97 S.Ct. 2777, 2814, 53 L.Ed.2d 867 (1977) (Stevens, J., concurring). Of course, *Biddle* also has never been cited in a U.S. Supreme Court majority opinion, though it was cited in a dissenting opinion for the proposition that a commutation does not require acceptance. *Schick v. Reed,* 419 U.S. 256, 273, 95 S.Ct. 379, 388, 42 L.Ed.2d 430 (1974) (Marshall, J., dissenting). Regardless of the opinion of some commentators, *see* opinion of SPECIAL JUSTICE GREEN, *ante,* at 412 n. 3, neither the *Nixon* concurrence nor any of the U.S. Circuit Courts of Appeals that have cited *Burdick* as authority have cited it with a disclaimer that it was modified or overruled in part (or in any way affected) by *Biddle.* *See, e.g., Hirschberg v. Commodity Futures Trading Comm'n,* 414 F.3d 679, 682 (7th Cir.2005); *North,* 62 F.3d at 1437; *Noonan,* 906 F.2d at 958; *Marino v. I.N.S.,* 537 F.2d 686, 692 (2d Cir.1976); *Bjerkan,* 529 F.2d at 128 n. 2; *United States v. Fitzgerald,* 235 F.2d 453, 454 (2d Cir.1956); *Healey v. United States,* 186 F.2d 164, 167 (9th Cir. 1951); *Lupo v. Zerbst,* 92 F.2d 362, 365 (5th Cir.1937); *Czarlinsky v. United States,* 54 F.2d 889, 893 (10th Cir.1931).

**21.** *Burdick* distinguished an executive pardon from a legislative grant of immunity, which requires no acceptance and carries no implication of guilt. 236 U.S. at 94, 35 S.Ct. at 270.

sumed in accepting the commutation which he sought.").

Historically, acceptance has been found in one of three ways in this country. The first is by the government seeking and obtaining an explicit acceptance. This is the most prevalent practice and was followed in the case of President Ford's pardon of Richard Nixon. Secondly, a pardon or commutation may prescribe a condition precedent to be performed by the individual. The Civil War pardons required the taking of an oath of allegiance as a condition to the operation of the pardon.

There is a third, somewhat murky area of acceptance: if other rights are dependent upon the pardon or commutation and are asserted. The best examples of this are the Civil War cases in which persons claimed property seized by the government as the result of the offenses for which they had been pardoned and relied upon the pardons to reclaim their property.

Leonard B. Boudin, *The Presidential Pardons of James R. Hoffa and Richard M. Nixon: Have the Limitations of the Pardon Power Been Exceeded?*, 48 U. Col. L.Rev. 1, 32–33 (1976) (footnotes and quotations omitted).

Prior to pardoning former president Nixon, President Ford, specifically relying on *Burdick*, sent a secret emissary to Nixon to ensure that the latter would accept an offered pardon in terms that admitted guilt. Nixon agreed and issued an acceptance that included the language: "I made errors of judgment and mistakes that violated criminal statutes and resulted in criminal prosecutions." Benton Becker,[22] *The History of the Nixon Pardon*, 30 Cumb. L.Rev. 31, 41 (1999–2000).

Acceptance is also an essential requisite to effect an executive pardon in Kentucky. *Adkins v. Commonwealth*, 232 Ky. 312, 23 S.W.2d 277, 280–81 (1929) ("A pardon is a deed to the validity of which delivery and acceptance are essential." (citing *Wilson*)).[23] I have found no authority for the proposition that acceptance is presumed from a failure to reject.[24] In *State ex rel.*

**22.** Becker was, in fact, the emissary in question.

**23.** Although SPECIAL JUSTICE GREEN's opinion asserts that *Adkins* rejected the holding in *Wilson* as a "relic of the past," *ante*, at 412, that quote is taken out of context. The portion of the *Adkins* opinion quoted in support of that assertion followed a quote from Blackstone that identified a restriction on the king's pardoning power, *viz:*

It is a general rule that wherever it may reasonably be presumed the King is deceived the pardon is void; therefore any suppression of truth or suggestion of falsehood in a charter of pardon will vitiate the whole, for the King was misinformed.

*Adkins*, 23 S.W.2d at 279 (citing 4 William Blackstone, Commentaries 400). The "relic of the past" comment referred to the fact that the rule permitting judicial review of a pardon allegedly procured by fraud was even more pertinent to a purported pardon by the chief executive of a republican form of gov-

ernment than by a king. *Id.,* 23 S.W.2d at 279–80.

**24.** JUSTICE JOHNSTONE's opinion cites *Redd v. State*, 65 Ark. 475, 47 S.W. 119 (1898), *Hunnicutt v. State*, 18 Tex. Ct.App. 498 (Tex.Ct.App.1885), and *Territory v. Richardson*, 9 Okla. 579, 60 P. 244 (1900), for the proposition that "other courts have extended this reasoning to conclude that acceptance of a pardon is assumed, once brought to the court's attention, absent proof indicating otherwise." *Ante*, at 361. However, those cases are inapposite. *Redd* and *Hunnicutt* were appeals by criminal defendants of their convictions on grounds that key prosecution witnesses were incompetent to testify because, though each respective witness had been presented a pardon, they had failed to validly accept the pardons, thus rendering the pardons invalid and, therefore, the witnesses incompetent to testify. *Redd*, 47 S.W. at 122; *Hunnicutt*, 18 Tex. Ct.App., at *14. In each case the court held that, though the record

*Barnes v. Garrett*, 135 Tenn. 617, 188 S.W. 58 (1916), the Supreme Court of Tennessee noted that "the court can neither know of the grant of a pardon *nor presume its acceptance* unless the facts are brought before it by motion, plea, or otherwise." *Id.* at 60 (emphasis added). *See also In re Fredericks*, 211 Or. 312, 315 P.2d 1010, 1015 (1957) (en banc) ("It is true that the Governor may pardon an offender by virtue of his constitutional power in that behalf, but even that is not effective, unless it is accepted by the prisoner to whom the pardon is offered.") (quoting *Carpenter v. Lord*, 88 Or. 128, 171 P. 577, 580 (1918)); *cf. In re Victor*, 31 Ohio St. 206 (Ohio 1877) (holding that acceptance of commutation by insane prisoner not required because a commutation is not a pardon).

### C. Attention of the Court.

Although courts are bound to take judicial notice of proclamations of general amnesty, which have the force of public law, *Jenkins v. Collard*, 145 U.S. 546, 560–61, 12 S.Ct. 868, 873, 36 L.Ed. 812 (1892), they do not take judicial notice of executive pardons. *Wilson*, 32 U.S. at 160–61, 8 L.Ed. 640; *Eighmy v. People*, 78 N.Y. 330, 333 (1879) (citing *Wilson*); *Garrett*, 188

S.W. at 60. The same rule was applied under English common law. *People v. Corning*, 2 N.Y. 9, 9 (1848) ("At common law it was held that the courts were not bound to take judicial notice of a pardon procured by the king's letters patent, but that it was otherwise in the case of a pardon by act of parliament."). A person relying on the king's pardon was required to specially plead it, and if he failed to do so and allowed himself to be put on trial under a plea of not guilty, he was deemed to have waived the pardon. 4 William Blackstone, *Commentaries on the Laws of England* *401.

The correct rule, gathered from the authorities, may be thus stated: The court does not take judicial notice of individual pardons. When one relies upon a pardon issued to him individually to relieve him from prison or for any other purpose he must in some way and in some proceeding call it to the attention of the court. The manner and the nature of the proceeding in which it is called to the attention of the court are not material. When the court's attention is called to the pardon it will not inquire into the motives which prompted the pardoning

---

did not contain direct evidence that the pardon was validly accepted, the fact that the witness *was permitted* to testify was sufficient circumstantial evidence that the pardon had been accepted (and, therefore, was valid) barring any evidence by the appellant to the contrary. *Redd*, 47 S.W. at 122; *Hunnicutt*, 18 Tex. Ct.App., at *14. In other words, the appellate court presumed that the lower court had obtained proof of acceptance. In *Territory v. Richardson*, the prosecution appealed the dismissal of a suit against the assistant cashier of a bank for receiving a deposit for a bank he knew was insolvent. *Richardson*, 60 P. at 244–45. The prosecution appealed the dismissal on grounds that the defendant had not accepted the pardon that had been issued by the Governor, which had formed the basis for the trial court's dismissal. *Id.* The appellate court held that "it is sufficient [proof of

acceptance] that the defendant brought the pardon to the notice of the court in his motion to dismiss." *Id.* at 247. Again, the issue was not whether acceptance of a pardon may be presumed, but whether the defendant's overt assertion of the pardon in support of his motion to dismiss in the trial court was adequate evidence on appeal that the pardon had been accepted (and was therefore valid). *Id.* In actuality, *Richardson* supports the view that a pardon must be specifically pled by the party wishing to avail him/herself of the pardon, discussed *infra*. *See Richardson*, 60 P. at 247 ("[T]he matter of pardon, when its benefits are sought, 'must be in some manner brought judicially before the court, by plea, motion, or otherwise.'" (quoting *Wilson*)). Manifestly, none of these cases stands for the proposition that acceptance is presumed from a mere failure to reject.

official to issue the pardon, for to do so would be to usurp the pardoning power; but the court will inquire into the authority of the pardoning official to issue the particular pardon in question, will inquire as to whether fraud was practiced upon the pardoning official, if that be suggested, though on that point much care must be exercised, and there is some division of authority on how that question may be raised, will examine the pardon to see that it is valid upon its face, and if it is conditional will inquire as to whether or not the conditions have been complied with.

*Jamison v. Flanner*, 116 Kan. 624, 228 P. 82, 85 (1924) (citations omitted). "A pardon has been described as a 'plea in bar,' comparable to the statute of limitations." *Abrams*, 689 A.2d at 10. In Kentucky, a formal plea is unnecessary; the pardon need only be called to the attention of the court. *Jackson v. Rose*, 223 Ky. 285, 3 S.W.2d 641, 643 (1928); *Powers v. Commonwealth*, 110 Ky. 386, 61 S.W. 735, 737 (1901). However, implicit in the holding in *United States v. Wilson* is that "only the individual affected may bring the pardon to the attention of the court." Mark Strasser, *The Limits of the Clemency Power on Pardons, Retributiyists, and the United States Constitution*, 41 Brandeis L.J. 85, 110 (2002). It is apparent from these authorities that a pardon takes effect only after a particular person is formally accused of a particular offense and calls the court's attention to the pardon as a defense to prosecution or, if after conviction, punishment. Thus, the Franklin Circuit Court should not have dismissed any of the indictments *sua sponte*. As will be discussed further, *infra*, a pardon issued prior to a formal accusation that initiates legal proceedings is invalid.

### D. Judicial Review and Interpretation.

As stated in *Jamison v. Flanner*, quoted above, a court, upon being presented with a purported pardon, has authority to "examine the pardon to see that it is valid upon its face." *Jamison*, 228 P. at 85. "A commutation of sentence may be effected by the Governor only by his acting in formal compliance with terms of section 4 of Article IV of the [New York] Constitution and the implementing statutes. There is no showing of formal compliance here." *People ex rel. Reynolds v. Martin*, 3 N.Y.2d 217, 165 N.Y.S.2d 26, 144 N.E.2d 20, 23 (1957). The following are some examples of why pardons have been declared invalid:

- Failure to comply with the requirement that either (1) notice be given prior to its issuance in the county where the crime was committed, or (2) include in the pardon a statement that such notice was not given. *Horton v. Gillespie*, 170 Ark. 107, 279 S.W. 1020, 1024–25 (1926).

- Failure of the person seeking remission of forfeiture to forward to the Governor with his application the opinion of a majority of the officers of the county where the forfeiture occurred attesting to the propriety of doing so. *State v. Dunning*, 9 Ind. 20, at *3–4 (1857).

- Failure of the person seeking the pardon to give notice of the application for pardon to the district judge or county attorney where the offense occurred, or by formal publication. *Jamison*, 228 P. at 99.

- Failure to obtain the recommendation of the Board of Pardons. *Rich v. Chamberlain*, 104 Mich. 436, 62 N.W. 584, 586 (1895).

Historically, Kentucky courts have also examined the validity of executive pardons. The most famous instance arose out of the contested gubernatorial election of 1899.

The three candidates for governor were William S. Taylor, William Goebel, and John Young Brown. On the face of the returns, the board of elections certified the Republican, Taylor, and his lieutenant governor candidate, John Marshall, the winners, and they were sworn into office. The Democrat, Goebel, and his lieutenant governor candidate, J.C.W. Beckham, filed an election contest before the Democrat-controlled legislature. On January 30, 1900, Goebel was mortally wounded on the capitol grounds by a gunshot fired from the Secretary of State's office. On February 2, 1900, the legislature declared Goebel and Beckham to have been the winners of the election. Goebel was sworn in as governor before he died on February 3, 1900. Beckham was sworn in as Governor after Goebel's death. However, in defiance of the legislative declaration, Taylor retained possession of the executive building, archives, and records, and continued to act as governor. *Taylor v. Beckham,* 108 Ky. 278, 56 S.W. 177, 177–78 (1900). Ultimately, our predecessor court held that the legislative determination that Goebel and Beckham had won the election was "conclusive of the controversy." *Id.,* 56 S.W. at 184.

Meanwhile, Taylor, Secretary of State Caleb Powers, and others were indicted for conspiracy to the murder of Goebel. Powers was brought to trial in March 1900. John Young Brown (the third gubernatorial candidate in the 1899 election) served as one of his defense attorneys. On March 10, 1900, during the course of the trial, Taylor purported to issue an executive pardon of Powers. The trial court refused to recognize it. On appeal, the Court of Appeals held that Taylor was not the *de jure* governor of Kentucky on March 10, 1900, thus the pardon was invalid. *Powers v. Commonwealth,* 110 Ky. 386, 61 S.W. 735, 737–38 (1901).

In *Adkins v. Commonwealth,* our predecessor court declared a pardon invalid because it had been procured by fraud. *Adkins,* 23 S.W.2d at 280. (Even the former governor who issued the pardon joined the action as a party plaintiff.)

> It is not the right of the Governor to issue the pardon that is in question, nor is there an interference or usurpation by the courts with his constitutional powers in that regard. To declare the pardon invalid is in effect but to deny the accused of all legal right thereunder and to prevent him from taking advantage of the wrong which he has practiced on the commonwealth.

*Id.*

Finally, it is elementary that a person cannot be pardoned for conduct that has not yet occurred or of which the chief executive is unaware.

> And if it is improper—and constitutionally impermissible—to pardon an offense which has not yet been committed, it is no more proper to pardon an offense which is not yet known to have been committed.... Knowledge of the commission of the offense must exist before the specific intent to pardon it can be formed; it is on that intent that the validity of a pardon depends.

Macgill, *supra,* at 84 (footnote omitted). And that, of course, is one reason why a pardon issued before formal accusation is invalid.

Even prior to Kentucky's 1890 Constitutional Convention, discussed at length *infra,* our predecessor court held that, while a pardon could issue prior to conviction, it could not issue until after the pardoned person had been formally charged with the offense to be pardoned.

> A fine or forfeiture cannot be remitted *until it has either been adjudged or the offense shall have been so charged and defined, in some judicial procedure for*

*enforcing its legal penalty,* as to identify it, and make the remission effectual as a bar to any other prosecution for the same act. *And the power of pardon is certainly as comprehensive as that of remission, and may be more so.* But, in all cases alike, the exercise of the executive prerogative of remission or pardon relieves from the offense, and discharges the accused from its legal penalty; and this may be done as well and effectually before as after formal *conviction.*

*Commonwealth v. Bush,* 63 Ky. (2 Duv.) 264, 265 (1865) (emphasis added). President Ford's pardon of Richard Nixon prior to indictment provides no precedent to the contrary; the only court challenges to the validity of that pardon were dismissed for lack of standing "to challeng[e] the pardon on behalf of the public." *McCord v. Ford,* 398 F.Supp. 750, 754–55 (D.D.C.1975); *Koffler v. Ford,* Civil No. 74–1406, slip op. (D.D.C. Sept. 25, 1974) (discussed in *McCord*).[25] The Nixon pardon has been accurately characterized as an anomaly. Macgill, *supra,* at 72. Nor can *Adkins* be cited as authority for the proposition that a pre-indictment pardon is valid. While the attempted pardon in *Adkins* was, as here, issued prior to indictment (presumably because the governor was leaving office the next day), 23 S.W.2d at 277, the pardon was, in fact, issued after formal charge and a preliminary hearing finding probable cause. *Id.,* 23 S.W.2d at 278. *See* discussion in Part v. of this opinion, *infra,* of when criminal proceedings are instituted so as to trigger the right to exercise the pardoning power. Regardless, our prede-

cessor court did not address that aspect of the pardon's validity but declared the pardon invalid because it had been procured by fraud. *Id.,* 23 S.W.2d at 280.[26]

As pointed out in the passage quoted *supra* from *Commonwealth v. Bush,* another reason there can be no pre-indictment general pardon is that, otherwise, the pardoned person could not plead the pardon as a bar to double jeopardy. Other reasons include (1) to assure that the pardon will be given effect only with respect to the offense intended to be pardoned, and (2) to protect the citizenry against executive irresponsibility. For these reasons, there has always existed the requirement of specificity.

> General words have also a very imperfect effect in pardons. A pardon of all felonies will not pardon a conviction or attainder of felony; (for it is presumed the king knew not of those proceedings) but the conviction or attainder must be particularly mentioned . . . .

4 Blackstone, *supra,* at *400.

The Framers of the U.S. Constitution considered three restrictions on the pardoning power, in addition to the impeachment restriction, and rejected all three, indicating an intent to give the president the same pardoning prerogatives that had been afforded the kings of England. Macgill, *supra,* at 82–83.

> [T]hey conferred upon the President such powers as the King of England had enjoyed, but no more. Specificity in the language of pardons, sufficient to ap-

---

**25.** Koffler was a law professor; McCord was one of the Watergate burglars.

**26.** For the same reason, SPECIAL JUSTICE GREEN'S opinion's reliance on *Burdick, ante* at 411, is misplaced. *Burdick* did not address the validity of a pre-indictment pardon but only the effect of a failure to accept same. But even if that were not so, the pardon in

*Burdick* was issued under Article II, section 2, clause 1 of the United States Constitution, which is substantially less restrictive than Section 77 of the Constitution of Kentucky. As discussed in Part III of this opinion, *infra,* the United States Supreme Court has upheld the authority of the President under Article II to issue pre-indictment amnesties.

prise all concerned of the offenses intended to be pardoned, and evidencing the grantor's knowledge of such offenses, was a due process limitation upon a power subject to no substantive restriction. The very character of the limitation was consistent with the tenor of the Convention's work, to secure and confirm the protections from executive irresponsibility their parliamentary predecessors had won in the preceding century. No modification was suggested at the Convention; the limitation [of specificity] can be presumed to have been imported into the presidential pardoning power of Article II.

*Id.* at 83.

If a completely general pardon may be granted, it might lead to extensive abuses. For instance, such a pardon might be framed for "any and all crimes committed by persons later found to have authorized" a certain grievous act.

Boudin, *supra*, at 35. Compare the pardon language of Governor Fletcher's Executive Order 2005–924, *viz:* "any and all persons who have committed or may be accused of committing, any offense up to and including the date hereof, relating in any way to the current merit system investigation being conducted by the special grand jury ...." Obviously, Executive Order 2005–924 does not satisfy the requirement of specificity or even indicate knowledge of the specific offenses being pardoned. In that respect, the attempted pardon is invalid. Under Kentucky law, an attempted pardon that is invalid in part is invalid *in toto*. *Hamilton v. Commonwealth*, 458 S.W.2d 166, 166 (Ky. 1970).

### III. AMNESTIES.

In England, only Parliament had the right to grant amnesties, sometimes referred to as "general pardons."

All pardons of treason or felony are to be made by the king, and in his name only . . . .

General pardons are by act of parliament . . . .

Edward Coke, *Institutes of the Laws of England* 233. The king could only issue pardons "within his prerogatives" or with the consent and approval of parliament. Max Radin, *Legislative Pardons: Another View,* 27 Cal. L.Rev. 387, 391–92 (1939). Nevertheless, the broad language of Article II of the United States Constitution has been held to include the power to grant amnesties. *United States v. Klein,* 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871). That however, does not deprive Congress of the concurrent right to grant amnesties. *Brown v. Walker,* 161 U.S. 591, 601, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896).

[Amnesty and pardon] are of different character and have different purposes. The one overlooks offense; the other remits punishment. The first is usually addressed to crimes against the sovereignty of the state, to political offenses, forgiveness being deemed more expedient for the public welfare than prosecution and punishment. The second condones infractions of the peace of the state. Amnesty is usually general, addressed to classes or even communities,-a legislative act, or under legislation, constitutional or statutory,-the act of the supreme magistrate.

*Burdick,* 236 U.S. at 94–95, 35 S.Ct. at 270–71.

Amnesties are general pardons given to relieve an entire class of citizens and are frequently granted for political offenses. Boudin, *supra*, at 2 n. 13; Black's Law Dictionary 83 (7th ed.1999). Presidential amnesties have generally been granted to reward wartime service or to forgive insurrection. To show how rarely and how

specially executive amnesties have been granted, consider the following list of all twenty-nine presidential amnesties granted in the history of the United States, by and to whom granted, and the nature of the action (all but the last are listed in Vol. 118, Cong. Record S9256 (daily ed. June 13, 1972)):

July 10, 1795, Washington; whiskey Insurrectionists (several hundred); general pardon to all who agree to obey the law thereafter.

May 21, 1800, J. Adams; Pennsylvania Insurrectionists; prosecution of participants ended; pardon not extended to those indicted or convicted.

Oct. 15, 1807, Jefferson; deserters given full pardon if they surrendered within four months.

Feb. 7, 1812, Oct. 8, 1812, June 14, 1814, Madison; deserters given full pardon if they surrendered within four months.

Feb. 6, 1815, Madison; Barrataria pirates (Jean Lafitte's men) who fought in War of 1812 pardoned of all previous acts of piracy for which any suits, indictments, or prosecutions were initiated.

June 12, 1830, Jackson (War Department); deserters, with provisions: (1) those in confinement returned to duty; (2) those at large under sentence of death discharged, never again to be enlisted.

Feb. 14, 1862, Lincoln (War Department); political prisoners paroled.

Mar. 10, 1863, Lincoln; deserters restored to regiments without punishment, except forfeiture of pay during absence.

Dec. 8, 1863, Lincoln; full pardon to all implicated in or participating in the "existing rebellion" with exceptions and subject to oath.

Feb. 26, 1864, Lincoln (War Department); deserters' sentences mitigated, some restored to duty.

Mar. 26, 1864, Lincoln (clarification of Dec. 8, 1863, proclamation).

Mar. 11, 1865, Lincoln; deserters who return to post in sixty days, as required by Congress.

May 29, 1865, A. Johnson; certain rebels of Confederate States (qualified).

July 3, 1866, A. Johnson (War Department); deserters returned to duty without punishment except forfeiture of pay.

Sept. 7, 1867, A. Johnson; rebels— additional amnesty including all but certain officers of the Confederacy on condition of an oath.

July 4, 1868, A. Johnson; full pardon to all participants in "the late rebellion" except those indicted for treason or felony.

Dec. 25, 1868, A. Johnson; all rebels of Confederate States (universal and unconditional).

Jan. 4, 1893, B. Harrison; Mormons (Church of the Latter Day Saints); liability for polygamy amnestied.

Sept. 25, 1894, Cleveland; Mormons— in accord with above.

July 4, 1902, T. Roosevelt; Philippine Insurrectionists; full pardon and amnesty to all who took an oath recognizing "the supreme authority of the United States of America in the Philippine Islands."

June 14, 1917, Wilson; 5,000 persons under suspended sentence because of change in the law (not war-related).

Aug. 21, 1917, Wilson; clarification of June 14, 1917 proclamation.

Mar. 5, 1924, Coolidge; more than one hundred deserters—as to loss of citizenship for those deserting since World War I armistice.

Dec. 23, 1933, F. Roosevelt; 1,500 convicted of having violated espionage or draft laws during World War I who had completed their sentences.

Dec. 24, 1945, Truman; several thousand ex-convicts who had served in World War II for at least one year.

Dec. 23, 1947, Truman; 1,523 individual pardons for draft evasion during World War II based on recommendations of President's Amnesty Board. (The Board reviewed the cases of 15,805 alleged offenders. Of the 1,523 pardoned, all had been convicted and had served part or all of their sentences.)

Dec. 24, 1952, Truman; ex-convicts who served in armed forces not less than one year after June 25, 1950 (Korean conflict).

Dec. 24, 1952, Truman; all persons convicted for having deserted their military positions between August 15, 1945, and June 1950.

Jan. 21, 1977, Carter; all persons who violated the Military Selective Service Act between August 4, 1964, and March 28, 1975 (Vietnam conflict). Proclamation 4483; Ex. Order 11967.

Viewed in the context of this historical record, Governor Fletcher's attempt to characterize as an "amnesty" his attempted pardon of "any and all persons who have committed, or may be accused of committing, any offense relating in any way to the current merit system investigation" is simply absurd.

I have found no instance in the history of Kentucky where a Governor purported to unilaterally grant an amnesty. Some of the delegates to the 1890 Constitutional Convention mistakenly believed that Governor Thomas E. Bramlette, who held that office from 1863–67, had issued a general pardon, or granted clemency, to all former Confederate soldiers. 1 Debates of Constitutional Convention of 1890 ("Debates") 1099 (A.J. Auxier, Pike, Martin, and Johnson Counties), 1115–16 (W.M. Beckner, Clark County). Others correctly recalled that Bramlette had only issued individual pardons to former soldiers who had been indicted for their wartime activities. *Id.* at 244 (John D. Carroll, Henry County). In fact, it was not Bramlette but the 1866 General Assembly that amnestied the Confederate soldiers by enacting "AN ACT to pardon all persons who have heretofore committed the crime of treason against the Commonwealth." 1866 Ky. Acts, ch. 107. Governor Bramlette had requested the action, Governor's Message to the General Assembly 12–13 (Dec. 4, 1865), no doubt recognizing that he, as governor, had no authority to issue a unilateral amnesty.[27]

---

27. SPECIAL JUSTICE GREEN's opinion speculates that Bramlette did not issue an executive amnesty because joining the Confederacy was treason, which could only be pardoned by the General Assembly. *Ante,* at 410. However, on April 16, 1861, Governor Beriah Magoffin wrote to U.S. Secretary of War Simon Cameron, in response to President Lincoln's call for troops, that "Kentucky will furnish no troops for the wicked purpose of subduing our sister states." 2 Samuel M. Wilson, *History of Kentucky* 308 (1928). On May 16, 1861, the General Assembly adopted a resolution "that the State and citizens thereof shall take no part in the civil war now being waged, except as mediators and friends to the belligerent parties; and that Kentucky should, during the contest, occupy the position of strict neutrality." Lowell H. Harrison & James C. Klotter, *A New History of Kentucky* 188–89 (1997). For complete text of the resolution, see 1861 H.J. 191–92 (May 1861 sess.). The resolution was never rescinded. Since Kentucky maintained *de jure* neutrality during the war, it would have been hard-pressed to assert that supporters of the Confederacy were guilty of treason—regardless of the title given to the Amnesty Act. Furthermore, as noted *infra* in the text, Bramlette did not hesitate to pardon Confederate soldiers who were charged by indictment in the courts for offenses alleged to have been committed by them as soldiers during the

Significantly, in that message Bramlette also said: "To forgive a man *who does not ask it* ... would be to offer a bounty to wrong," *id.* at 13 (emphasis added), evidencing an understanding that a pardon of any kind must be premised upon individual application and acceptance. Bramlette did subsequently grant individual pardons to soldiers of both armies *"who were charged by indictment,* in the courts, for offenses alleged to have been committed by them as soldiers, while in the service, and during the war," Governor's Message to the General Assembly 4 (Adjourned Sess., Jan. 3, 1867) (emphasis added), evidencing his further understanding that an indictment is a condition precedent to an executive pardon.

## IV. KENTUCKY CONSTITUTION SECTION 77.

The Governor's pardoning power was defined in the Third (1850) Constitution of Kentucky as follows:

He shall have power to remit fines and forfeitures, grant reprieves and pardons, except in cases of impeachment. In cases of treason, he shall have power to grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested; but he shall have no power to remit the fees of the clerk, sheriff, or Commonwealth's Attorney, in penal or criminal cases.

Ky. Const. art. III, § 10 (1850).

On September 8, 1890, the delegates elected to the 1890 Constitutional Convention assembled in Frankfort to begin more than a year of deliberations and debates that would culminate in the approval of our present (1891) Constitution. Among those delegates were the then-sitting governor,

Simon Bolivar Buckner, delegate from Hart County, and a former governor, J. Proctor Knott, delegate from Marion County. Their presence is mentioned because they were the only members of the convention to have ever exercised the pardoning power, and both opposed amending the language in Article III, § 10, of the 1850 Constitution. 1 Debates 1090–91, 1322. Nevertheless, the language was amended and the following was adopted as Section 77 of the 1891 Constitution (amendatory language in bold face):

He shall have the power to remit fines and forfeitures, **commute sentences,** grant reprieves and pardons, except in cases of impeachment, **and he shall file with each application therefor a statement of the reasons for his decision thereon, which application and statement shall always be open to public inspection.** In cases of treason, he shall have power to grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested; but he shall have no power to remit the fees of the clerk, sheriff, or Commonwealth's Attorney, in penal or criminal cases.

To understand the significance of the amendment, it is necessary to document both the constitutional environment in which the amendatory language was added and the debates that led to the amendment. "[I]n construing constitutional provisions, [the courts] will look to the history of the times and the state of existing things to ascertain the intention of the framers of the constitution and the people adopting it ...." *Posey v. Commonwealth,* 185 S.W.3d 170, 192 (Ky.2006) (quoting *Shamburger v. Duncan,* 253 S.W.2d 388,

war. Thus, it seems more likely that he was acting upon a recognition that he could not pardon persons not yet formally charged rath-

er than upon a recognition that he could not pardon treason.

390–91 (Ky.1952)). Further, "[i]t is a familiar aid in the interpretation of a provision of a constitution to examine the proceedings of the convention. If they clearly reveal the purpose of the particular provision the debates will be accepted as an indication of [their] meaning ...." *Id.* at 190 (quoting *Barker v. Stearns Coal & Lumber Co.,* 287 Ky. 340, 152 S.W.2d 953, 956 (1941)).

None of the first three Constitutions of Kentucky contained language identical to that found in Article II, section 2, clause 1 of the U.S. Constitution. Both the 1792 and 1799 Kentucky Constitutions contained the additional limiting language now found in Section 77 that reserves to the General Assembly the power to pardon treason. Ky. Const. art. II, § 10 (1792); Ky. Const. art. III, § 11 (1799). The 1850 Constitution, quoted *supra,* added the limitation denying the power to remit the fees of the clerk, sheriff, or Commonwealth's Attorney in penal or criminal cases.

As of 1890, only one of the forty-three state constitutions then enacted, Vermont's, granted its governor a pardon power nearly as broad as that contained in Article II of the U.S. Constitution. But even Vermont denied its governor the power to pardon treason. Vt. Const. ch. 2, § 11 (1836).[28] The Constitution of Connecticut granted its governor only the power of reprieve, not pardon.[29] Conn. Const. art. IV, § 10 (1818). The power to pardon had been reserved to the General Assembly by the former colony's charter of 1662.

The constitutions of seven states reserved to the legislature the right to determine how the governor's pardoning power should be exercised.[30] Sixteen state constitutions reserved to the legislature the right to adopt regulations with respect to applications for pardons.[31] Five state constitutions established pardon boards to consider or approve pardons.[32] Three state constitutions required the governor to obtain the advice and consent of council (presumably a form of pardon board).[33]

**28.** In discussing the constitutions of the various states prevalent in 1890, the date used will be the date on which the pardoning provision was adopted or last amended.

**29.** In 1949, South Carolina amended its pardoning provision, S.C. Const. art. IV, § 11, to remove the pardoning power from its governor. *Bearden v. State,* 223 S.C. 211, 74 S.E.2d 912, 913 (1953).

**30.** Ala. Const. art. IV, § 11 (1819); Ind. Const. art. V, § 17 (1851); Iowa Const. art. IV, § 16 (1857); Kan. Const. art. I, § 7 (1859); Or. Const. art. V, § 14 (1857); Va. Const. art. IV, § 4 (1830); Wash. Const. art. III, § 9 (1889).

**31.** Ark. Const. § 18 (1874); Cal. Const. art. V, § 13 (1849); Colo. Const. art. IV, § 7 (1876); Fla. Const. art. V, § 12 (1868); Ga. Const. art. V, para. 12 (1877); Ill. Const. art. V, § 13 (1870); Mich. Const. art. V, § 11 (1850); Mo. Const. art. V, § 6 (1865); Neb. Const. art. V, § 13 (1866); Nev. Const.

art. V, § 14 (1864); N.Y. Const. art. IV, § 5 (1846); N.C. Const. art. III, § 6 (1868); N.D. Const. § 76 (1889); Ohio Const. art. III, § 11 (1851); Wis. Const. art V, § 6 (1848); Wyo. Const. art. IV, § 5 (1889).

**32.** Idaho Const. art. IV, § 7 (1890) (Governor, Secretary of State, and Attorney General); Mont. Const. art. VII, § 9 (1889) (Governor with approval of Secretary of State, Attorney General, and State Auditor); Nev. Const. art. V, § 14 (1864) (Governor, Justices of Supreme Court, and Attorney General); N.J. Const. art. V, §§ 9, 10 (1844) (Governor, Chancellor, and six judges of the Court of Errors and Appeals); S.D. Const. art. IV, § 5 (1889) (for pardon of capital offense, must have written recommendation of board of pardons consisting of presiding judge, Secretary of State, and Attorney General).

**33.** Me. Const. art. II, § 19 (1851); Mass. Const. § 1, ch. 2, art. VIII (1780); N.H. Const. pt. 2, § 52 (1792).

Two state constitutions required the governor to obtain the consent of the state senate.[34] Four state constitutions required public posting of applications for pardons.[35] Four state constitutions required the governor to report his pardons to the legislature.[36]

Most importantly to the delegates to the 1890 convention, the constitutions of thirty-four of thirty-nine states that granted pardoning power to the governor and did not reserve to the legislature the authority to regulate that power limited any exercise of the governor's pardoning power to "after conviction."[37] Of the remaining five states, two, Pennsylvania and Rhode Island, withheld from the governor the power to act unilaterally. Pa. Const. art. IV, § 9 (1873) (requiring that the pardon be recommended in writing by the Lieutenant Governor, Secretary of the Commonwealth, Attorney General, and Secretary of Internal Affairs, or any three of them, and only after full hearing and due public notice and in open session); R.I. Const. art. VII, § 4 (1854) (requiring consent of the

Senate). That left only three state constitutions, those of Delaware, Maryland, and Vermont, in addition to Kentucky, that did not limit the unilateral right of their governors to exercise the pardoning power to "after conviction." There are no cases from Delaware, Maryland, Vermont, Pennsylvania, or Rhode Island even suggesting that their governors could validly issue a pre-indictment pardon under their constitutions. In fact, no state court has ever held that a pardon could be validly issued before indictment. Until today. Pertinent to the reasons the individual states declined to adopt or keep the broad pardoning power granted by Article II of the U.S. Constitution is the explanation in *State v. Dunning*, 9 Ind. 20 (1857), for the substantial restrictions placed on Indiana's pardoning power by the Constitution of 1851:

> The new Constitution differs from the old in few points more widely than upon this of the pardoning power. Two lines in the old, stood in the place of half a page in the new. . . . We know the object of the change. The granting of pardons,

**34.** Miss. Const. art. V, § 10 (1832) (amended November 1, 1890, during the course of the Kentucky Constitutional Convention, to article V, § 124 (1890)); R.I. Const. art. VII, § 4 (1854).

**35.** Idaho Const. art. IV, § 7 (1890) (notice of application to be published for four weeks); Md. Const. art. II, § 19 (1851) (notice to be published in one or more newspapers of application and of day on which decision will be made); Mont. Const. art. VII, § 9 (1889) (notice to be published in newspaper for two weeks); Pa. Const. art. IV, § 9 (1873) ("upon due public notice").

**36.** Cal. Const. art. V, § 13 (1849); Del. Const. art. III, § 9 (1831); Md. Const. art. II, § 19 (1851); Mo. Const. art. V, § 6 (1865).

**37.** Ark. Const. § 18 (1874); Cal. Const. art. V, § 13 (1849); Colo. Const. art. IV, § 7 (1876); Fla. Const. art. V, § 12 (1868); Ga.

Const. art. V, para. 12 (1877); Idaho Const. art. IV, § 7 (1890); Ill. Const. art. V, § 13 (1870); Ind. Const. art. V, § 17 (1851); Iowa Const. art. IV, § 16 (1857); La. Const. art. LXVIII (1879); Me. Const. art. V, pt. 1, § 11 (1820); Mass. Const. § 1, ch. 2, art. VIII (1780); Mich. Const. art. V, § 11 (1850); Minn. Const. art. V, § 4 (1857); Miss. Const. art. V, § 124 (1890) (*see* note 38, *infra*); Mo. Const. art. V, § 6 (1865); Mont. Const. art. VII, § 9 (1889); Neb. Const. art. V, § 13 (1866); Nev. Const. art. V, § 14 (1864); N.H. Const. pt. 2, § 52 (1792); N.J. Const. art. V, §§ 9, 10 (1844); N.Y. Const. art. IV, § 5 (1846); N.C. Const. art. III, § 6 (1868); N.D. Const. § 76 (1889); Ohio Const. art. III, § 11 (1851); Or. Const. art. V, § 14 (1857); S.C. Const. art. III, § 11 (1868); S.D. Const. art. IV, § 5 (1889); Tenn. Const. art. III, § 6 (1835); Tex. Const. art. V, § 11 (1845); Va. Const. art. IV, § 4 (1830); W. Va. Const. art. VII, § 11 (1872); Wis. Const. art. V, § 6 (1848); Wyo. Const. art. IV, § 5 (1889).

remissions, etc., had become an abuse and it was the intention to arrest that abuse.

*Id.* at 23.

Delegates to the 1890 convention were aware of the pardon provisions contained in other state constitutions, and a number of proposed drafts were premised upon other states' provisions. *E.g.,* "[W]hen I came to the Convention I was strongly inclined to give the Governor of Kentucky a Board of Pardons, as they have in other states." 1 Debates 1091 (remarks of Delegate H. Cox, Carroll County). Delegate Curtis F. Burnam, Madison County, later commented on the number of state constitutions that limited gubernatorial pardons to post-conviction and the number of states that required presentation to the legislature of relevant facts that justified the pardon. *Id.* at 1247–49. Delegate Charles J. Bronston, Lexington, noted (mistakenly, it seems) that "there were but four States left in this Union of ours that have failed to incorporate these same provisions in their Constitutions. Those four states are Delaware, Georgia, Kentucky and Mississippi," thereafter noting that the Constitution of Mississippi had been amended on November 1, 1890, leaving only three.[38] *Id.* at 1323.

JUSTICE JOHNSTONE's opinion states that "the pre-indictment pardon was not particularly debated at length" during the 1890 convention. *Ante* at 359. In fact, it was not debated at all.[39] And for good

reason: it would never have occurred to the delegates that a valid pardon could be issued before indictment or formal charge. The great debate at the convention was whether the constitution should be amended to preclude a pardon before conviction. The intent and understanding of the delegates that pardons would be granted only after formal charge and only upon application by the person seeking to be pardoned is apparent from the amendments they proposed and from the statements they made during the debates.

It should first be noted that there was substantial discontent with the notion of any power to pardon.

> If there has been any one thing discussed more than another in the country from which I come, it is the exercise of this [pardoning] power by the Governor. Unintentionally, I have no doubt, but it has encouraged violations of the criminal law. Offenders against the criminal law, in every branch, have been pardoned, or fines and forfeitures have been remitted, as we all know. . . .
>
> . . . .

That [sentiment that the pardon power is abused and secretive] was repeated by the then distinguished Delegate from the county of Bourbon, Mr. Davis, who said:

> I have heard such complaints ever since my boyhood, that the exercise of this power under our Constitution has

---

38. While in the midst of a speech in support of limiting the pardon power only to after conviction and requiring the governor to report his pardons to the General Assembly, Delegate Bronston remarked that he had just been handed a copy of the new Constitution of Mississippi, adopted on November 1, 1890, in which Mississippi had adopted the "after conviction" requirement.

39. In support of his claim that the delegates approved of the pre-indictment pardon, JUS-

TICE JOHNSTONE states that "little distinction would be drawn between a pardon prior to indictment versus a pardon prior to conviction, as both precede a legal determination of guilt." *Ante,* at 360. As will be seen from their very words and the proposals they introduced, discussed *infra,* the delegates clearly understood that they were discussing only pardons issued after indictment or formal charge.

been subject to some abuse, and some considerable abuse, too. I do not know how the present Executive has exercised this power to remit fines and forfeitures, and to grant pardons, but in a single instance, and that through publications in the newspapers; but for twenty-five years I have heard frequent and constant complaints of the abuse of this power ....

*Id.* at 1102–03 (remarks of Delegate Labon T. Moore, Boyd and Lawrence Counties). Delegate H.G. Petrie, Todd County, remarked:

I am utterly opposed to constituting the Governor of the State a Criminal Court. Take jurisdiction from the regularly organized Court and try cases upon *ex parte* testimony without even the sanction of an oath.... You cannot better destroy the confidence of the people of the State in the laws and institutions of our country than to take from their midst a man who has been accused of an atrocious crime, and without a hearing so far as they are concerned, and without their knowledge, pardon him, and he goes back a free man without any investigation.... *Parties have a right to apply to him for pardons.* A man accused of a crime comes with his friends and attorney, present to the Governor what they say are the facts in the case. They are influential men, they are the friends of the Governor. He cannot, without an insult to them, say: "I doubt what you say." He cannot question the facts they present. He must act upon this *ex parte* statement for the accused man and his friends and relatives, and upon that he grants a pardon without any notice to the people of the community where the alleged crime occurred.

*Id.* at 1110 (emphasis added). Delegate J.T. Funk, representing the Seventh District of Louisville, remarked: "Let us throw every safeguard around the exercise of the pardoning power we possibly can ...." *Id.* at 1294. Delegate Bronston, the Commonwealth's Attorney for Fayette County, noted:

Now, one single suggestion on the other branch of it and that is as to whether or not experience has taught us that there should be some limitation placed upon the pardoning power. Do not the people complain that too often the guilty has been pardoned, and by pardoning the guilty crime has been encouraged. If that has been the experience of the Delegates, the next question is what limitation shall be imposed.

*Id.* at 1089. Delegate George Washington, Campbell County, the president of the convention, was concerned about future corrupt governors:

I am opposed to lodging this great power in the hands of the Governor for several reasons. One of the first and most important of these reasons is its extreme liability to abuse. We may have just the kind of a Governor today that we ought to have and that we would like to have. What kind of a Governor we may have next year or in the future, no man is prophet enough to tell. It is not given to any man to penetrate the veil which conceals from our vision the future.... I can very easily conceive of a condition of circumstances when, in the agitation of the times, some man might be lifted to the Executive chair who is totally unworthy of it.... *The very application for a pardon implies guilt.* How is it going to be investigated? By what compulsory process shall he enforce the attendance of witnesses? How shall the peculiar circumstances surrounding each case be made to apply to it? I believe it has already been suggested by some gentleman that the examination would necessarily be *ex*

*parte;* that one side in many instances would be entirely unheard.... To say that such a power as that is liable to abuse is simply to give expression to what is perfectly self-evident. It goes without saying.

*Id.* at 1112–13 (emphasis added). Thus, in addition to opposing the pardoning power, Delegate Washington also anticipated the U.S. Supreme Court's recognition in *Burdick*, twenty-five years later, that application for a pardon confesses guilt; thus, the only person entitled to make such application is the person to whom the confession will be attributed. Certainly, one party cannot confess another's guilt. Delegate J.G. Forrester, Harlan, Perry, Bell, and Leslie Counties, also expressed concern that a future governor might abuse the pardoning power:

I hope that this power will be taken from the Governor, not that I believe that he has exercised it wrongfully, but that he may do it hereafter. Some circumstances that we cannot foresee may actuate him to do it when it should not be done.

*Id.* at 1121. However, Delegate W.M. Beckner, Clark County, felt that future governors, elected by citizens cleansed by advances in education and Christian ideals, would be less likely to abuse the power than those in the past.

Gentlemen say it may be abused, but that is presuming that the Commonwealth will elect men unfit to exercise the power. I have faith that the people of the future will do better than they have done in the past, because there will be the influences of the Christian religion, and the power of a better system of education to improve the people of the future, and to make them better than the people of the past or of the present have been or are; and I take it for granted that the people of that greater

future will elect better men even than the people of the past have done.

*Id.* at 1116. Finally, Delegate Burnam, anticipating the magnitude of the convention's decision on this issue, expressed the hope of all: "But whatever the result of the vote may be, let us all hope the Commonwealth will not suffer wrong—'ne quid detrimentum respublica capiat.'" *Id.* at 1250.

On September 18, 1890, Delegate Burnam introduced a resolution that the Committee on the Executive prepare a report on an amendment to Article III, § 10, of the 1850 Constitution as to:

"whether the governor of this Commonwealth shall be permitted by the Constitution to pardon crimes *before conviction* of *parties charged* with same, and upon the propriety of establishment of a Board of Pardons ...."

1 Debates 144 (emphasis added) (evidencing his assumption that no person would be pardoned before being charged). On September 23, 1890, Delegate J.M. Wood, Green and Taylor Counties, introduced the following resolution:

*Resolved,* That section 10, article 3, of the Constitution, be amended as follows: By adding to said section the words, "The Governor shall communicate to the Legislature, at the beginning of every session every case of fine or forfeiture remitted, or reprieve, pardon or commutation granted, stating the name of the convict, *the cause for which he was convicted,* the sentence, its date and the date of its remission, commutation, pardon or reprieve."

*Id.* at 217 (emphasis added). On September 26, 1890, Delegate S.P. Hogg, Clay, Jackson, and Owsley Counties, introduced the following resolution:

*Resolved,* That the Governor shall have power to remit, *after conviction,* all

forfeitures, fines and penalties, and grant reprieves and pardons, except in case of impeachment upon such condition and with such restriction as may seem proper, *subject to such regulations as may be provided by law; and he shall communicate to the Legislature at each session thereof, each case of reprieve, remission of penalty, or pardon granted, stating the name of the convict, the crime of which he was convicted, the sentence and its date of reprieve, remission of fine or pardon, and the condition, if any, upon which the same was granted.*

*Id.* at 267 (emphasis added). This resolution contained three restrictions found in other state constitutions: (1) no pardon may be issued before conviction; (2) the legislature retains authority to determine how the pardoning power will be exercised; and (3) the Governor must report his pardons to the General Assembly at every session.

On November 7, 1890, Delegate Moore proposed to amend Article III, § 10 to add after "forfeitures" the words "[u]nder such rules and regulations *as may be prescribed by law,* and *after conviction* ... and ... [h]e shall indicate to the General Assembly at their regular session each case of reprieve, commutation of pardon granted, *the reasons therefor,* stating the name of the convict, time of sentence, its date, and the day of reprieve, commutation or pardon." *Id.* at 1086–87 (emphasis added). This was the first proposal that would require the governor to state his reasons for the pardon.

On the same day, Delegate Bronston submitted the following proposed amendment:

The Governor shall have the power to grant reprieves, remissions, pardons and commutations of sentence *after convictions* for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may think proper. Upon conviction of treason the Governor shall have power to suspend the execution of the sentence until the case shall be reported to the General Assembly at its next meeting, when the General Assembly shall either pardon, direct the execution of the sentence or grant a further reprieve. *The Governor shall communicate to the General Assembly at the beginning of every session every case of reprieve, remission, pardon or commutation of sentence, stating the name of the person convicted, the crime for which he was convicted, the sentence, its date, the date of the pardon, reprieve, remission or commutation and the reason for granting the same;* but the Governor shall have no power to remit the fees of the Clerk, Sheriff, or Commonwealth's Attorney in penal or criminal cases.

*Id.* at 1087 (emphasis added). Under Bronston's proposal, the General Assembly would not retain the right to determine how the pardoning power would be exercised, but the proposal would limit pardons to "after conviction" and require the Governor to report his actions to the General Assembly and give his reasons therefor. Moore then withdrew his amendment in favor of Bronston's. *Id.* Bronston then suggested that the Governor be required to keep on file the petitions and letters on which he grants pardons or remissions, and furnish the same to the Legislature at its next session. *Id.*

On November 14, 1890, Delegate W.R. Ramsey, Laurel and Rockcastle Counties, proposed the following amendment to Bronston's proposal:

*Provided, however,* That the General Assembly may, by law, constitute a Council, to be composed of officers of the

State, without whose advice and consent the Governor shall not have power to grant pardons in any case, except such as may be left to his sole power.

*Id.* at 1250. Presumably, the "except" clause would allow the General Assembly to enact statutes giving the governor the power to grant unilateral pardons in certain cases.

Governor Buckner, who opposed the "after conviction" restriction,[40] related an incident that occurred during his term of office in which a great disturbance arose in one county. He reported it to the legislature, which unanimously recommended that he exercise the *"Constitutional power given to the Governor to pardon those under indictment."* *Id.* at 1090–91 (emphasis added). Thus, Buckner, like Bramlette before him, evidenced an understanding that the pardon power existed only after indictment.

Though arguing against any restrictions on the governor's pardoning power, Delegate Auxier also anticipated *Burdick* and further evidenced his understanding that each pardon would be premised upon an individual application by the guilty party:

> Whenever a man applies to the Chief Executive for pardon, it is tacitly admitting that he is guilty. It is not the innocent man who applies to the Governor for pardon. It is the guilty man; it is the man who, by the strict and rigid rule and letter of the law, has been guilty of some violation of the law; and yet there are considerations connected with his offense that entitle him to Executive clemency.... If he is innocent, he

does not have to apply to the Governor at all. It is presumed, if he is innocent, he can go before a Court and jury, and there vindicate himself, and establish his innocence. Consequently, there is no necessity for a pardon for an innocent man....

> ....

> ... I believe it would be well enough, although no amendment of that kind has been offered, it might be a good thing to provide that in this Constitution, before any petition should be acted upon by the Governor, *that the applicant for pardon should advertise* in the county newspapers, where the offense was committed, at least two weeks, *that he intended to make an application to the Governor for pardon,* or if there be no newspaper in the county, that he advertise on the Court-house door for at least two or three weeks, so that his neighbors and acquaintances and civil authorities should have notice that application for the pardon was going to be made. Such a restriction as that I would be in favor of. That would give every citizen who is interested the power to send up a remonstrance against the exercise of this pardoning power, if they thought proper to do so.

*Id.* at 1096–98 (emphasis added). Auxier subsequently offered such an amendment. *Id.* at 1123. Auxier also referred to relieving *"the defendant* from the penalty of law," *id.* at 1099 (emphasis added), indicating that any pardon would issue at the earliest after indictment.

---

**40.** Governor Buckner had served as a lieutenant general of the Confederacy. He led an army into Kentucky on orders of General A.S. Johnston in September 1861, penetrating as far as Rolling Fork Station, forty miles south of Louisville, and commanded a division in Bragg's invasion of Kentucky, participating in the Battle of Perryville in October 1862.

Ezra J. Warner, *Generals in Gray* 38 (1959); 2 Samuel M. Wilson, *History of Kentucky* 322–23 (1928). Thus, he was a direct beneficiary of the 1866 Amnesty Act as well as President Johnson's general amnesty of September 7, 1867, and full pardons of July 4, 1868, and December 25, 1868.

Delegate Emery Whitaker, Mason County, also evidenced an understanding that a pardon would issue only to a guilty person and that a Governor could not unilaterally declare a person guilty by issuing a pardon before a grand jury indictment.

> The argument seems to be, that a man is presumed to be innocent by the law (which is true) until he is proven to be guilty; and, therefore, whenever the Governor is asked to pardon before conviction, he is asked to say that the man is guilty without a trial, for none need pardon except the guilty, and that to pardon a man from a charge of crime is reversing the law, which presumes him to be innocent, because if innocent he needs no pardon. I look on that question in a different light from what it has been discussed. *No man in the Commonwealth of Kentucky can be charged with crime save by a grand jury of sixteen men.* That grand jury sit [sic] by themselves as the inquisitorial power sworn to do justice and right as much so as a petit jury when they try the question of guilt or innocence. They accuse a man of crime upon what? Not upon rumor, not upon their own volition, but upon legal testimony delivered to them upon the oaths of witnesses. Upon that they charge a man with crime. . . . You say he shall not have *the power to pardon a man from what? From a charge of crime. That is what he is pardoned from,*[41] on proof which is competent and truthful that the man is not guilty.

*Id.* at 1104 (emphasis added). Whitaker also expressed his understanding of the nature of an application for a pardon.

> Now, when a person presents his petition to the Governor, what does he present? Not a mere petition to be pardoned. He sets forth the circumstances that can be shown by reliable witnesses of the vicinage that there has been a mistake in the charge of crime against him, and he asks the Governor to excuse him.

*Id.* (Note that Nighbert's application for pardon stated no reasons whatsoever.) Delegate James Blackburn, Woodford County, also expressed his understanding that the application for pardon would occur after formal charge: "How stands the case? *A party is charged, either by warrant or indictment,* with a violation of the law, a misdemeanor or a felony, if you please." *Id.* at 1118 (emphasis added).

On November 8, 1890, P.P. Johnston, Fayette County, offered a proposed amendment that would subsequently be adopted in part:

> Amend section 10 by inserting after the word "impeachment," in the third line, the words, "*And he shall file with each application a statement of the reasons for his decision thereon, which shall always be open to public inspection.*"

*Id.* at 1123 (emphasis added). It seems no coincidence that this proposal followed closely on the heels of comments in the debate indicating that the delegates understood that the application would be made personally by the party seeking the pardon. In the debate over this provision, the delegates' primary concern was the need for transparency, *i.e.,* that the application furnish to the governor accurate informa-

---

**41.** JUSTICE JOHNSTONE's opinion quotes this sentence out of context, *ante,* at 360, misconstruing Whitaker's statement to mean that he "expressly advocated pardons prior to indictment." *Id.* However, JUSTICE JOHNSTONE's opinion omits from the quotation Whitaker's statement earlier in the same paragraph, *viz.,* "No man in the Commonwealth of Kentucky can be *charged* with crime save by a grand jury of sixteen men." 1 Debates 1104 (emphasis added). Thus, the full quote actually reaffirms the fact that pre-indictment pardons were not considered during the debates.

tion and that the governor·furnish to the citizens the reasons for granting the pardon.

Mr. A. is charged with crime. He does not want the expense and disgrace of a trial. He goes to the Governor and makes to him certain representations. How is that Governor to know whether those statements are true or not? No witness is sworn; it is entirely *ex parte;* no one can be sworn. All the statements the Governor receives are those from friends of the accused, without the sanction of an oath....

....

... It is my judgment that when twelve men out of sixteen have made a presentment, twelve other unbiased and unprejudiced men on their oaths, after a full investigation, say the accused is guilty beyond a reasonable doubt and the trial Judge approves of that finding, I say, when the Governor of the Commonwealth annuls that verdict and judgment he ought to have reasons for it and the people have a right to know those reasons.

*Id.* at 1261–62 (remarks of Delegate Joseph Blackwell, Owen County).

"Applications for clemency are almost universally *ex parte* statements, seldom giving the facts which were proved in the case, and very often are misrepresentations."

*Id.* at 1268 (remarks of Delegate W.R. Ramsey, Laurel and Rockcastle Counties, quoting from Governor Buckner's Message to the Legislature during its 1887 session).

What is the real evil as disclosed by the speeches made upon this floor? It seems to me to be this: That the Governor acts upon the statements coming from one side; that it is an *ex parte* proceeding. The accused or the convicted presents his side of the case, and, of course, he and his friends will present it

as strong as they possibly can, and the other side is not heard.

*Id.* at 1289–90 (remarks of Delegate J.A. Brents, Clinton and Cumberland Counties).

On November 15, 1890, Delegate J.F. Montgomery, Adair County, offered the following proposed amendment of Article III, § 10:

The Governor shall, in each case of reprieve, remission, pardon or commutation of sentence, cause to be prepared a written statement of the reasons for granting the same, a record of which shall be kept by the Secretary of State in a book to be kept for that purpose as a public record, and a copy of said written statement shall be transmitted *to the Court in which the prosecution is pending or judgment was rendered,* which shall be filed and noted of record in said Court.

*Id.* at 1273 (emphasis added). Note again the invariant assumption that the pardon would not precede an indictment. In arguing in support of his amendment, Montgomery remarked:

The statements are often presented to the Governor of men of character and influence, who are personally known to him, and who are appealed to on account of their influence and their position, and they yield on account of their desire *to curry favor with the person who makes the application* ....

*Id.* at 1288 (emphasis added). Note again the assumption that the person seeking the pardon would make the application though third parties might speak in support of it. Likewise, in speaking in favor of his proposal, Delegate Bronston remarked:

An application is made to the Executive for a pardon. What does the Executive do? He says, "*This citizen* of the Com-

monwealth of Kentucky is charged with having violated a law. I must determine one of two things: first, upon the case as presented to me, is he guilty? Or if he be guilty, is it a case where I should exercise mercy?"

*Id.* at 1326 (emphasis added).

Bronston's proposed amendment that would have included the "after conviction" language and the requirement of a report to the General Assembly failed by a vote of 41–36 (23 absent)—with both Governor Buckner and former Governor Knott voting "nay." *Id.* at 1347. Johnston's proposed amendment requiring the governor to "file with each application a statement of the reasons for his decision thereon which shall always be open to public inspection" was adopted, though the record of the debates does not reflect the yeas and nays. *Id.* at 1344. However, on November 22, 1890, Delegate George C. Harris, Simpson County, noted that under the adopted language the governor could destroy the application and thereby preclude the public from knowing on what grounds the application for pardon was premised. Harris moved to further amend the amended provision by inserting after the word "which" the words "application and statement." 2 Debates 1520. The amendment was adopted, *id.* at 1520–21, thus completing the language of what is now Section 77. Former Governor Knott was absent when the vote was taken. *Id.* at 1521. Again, Governor Buckner voted "nay," *id.,* indicating that he considered

the requirements of application and statement of reasons to be a new and additional restriction on the pardon power.[42]

From this detailed examination of the constitutional climate and the 1890 debates, I conclude that the convention delegates *did not* intend that the pardoning power be exercised before indictment or formal charge; that they *did* intend that each person seeking a pardon would submit his or her own individual application, stating the reasons therefor; that the governor would state written reasons for granting the pardon; and that the governor would retain together for public inspection both the *application and* the *pardon. Posey,* 185 S.W.3d at 190, 192. Absent the requirements of an indictment,· an individual application, and specificity (as discussed in Part II–D of this opinion, *supra* ), a governor could, upon application of, *e.g.,* the lieutenant governor, avoid even the empaneling of a grand jury to investigate alleged corruption within the administration by simply issuing an executive pardon every Friday afternoon of "any and all persons in my administration who have committed, or may be accused of committing, any offense up to and including the date hereof, including but not limited to any violation of the Kentucky Penal Code and KRS [fill in the blank]."

## V. GRAND JURY INDICTMENTS AND REPORT.

The grand jury is an independent agency of constitutional origin. *Hoskins v.*

---

**42.** JUSTICE JOHNSTONE's opinion simply ignores the requirements of individual application and written statement of reasons, asserting: "The delegates of the Constitutional Convention ultimately declined to adopt *any* limitation as to when pardons could be issued. It is contrary to logic to recognize that the framers considered and rejected multiple amendments limiting the pardon power, but conclude that the framers intended that such limitations be implied nonetheless." *Ante,* at

360. What is "contrary to logic" is the conclusion that the Framers of our 1891 Constitution intended that a governor could disable a grand jury investigation into alleged wrongdoing by members of his own administration by issuing a blanket pardon of unnamed individuals prior to indictment without any individual application by those allegedly pardoned. Section 77 was adopted to ensure public accountability by future governors in the exercise of a power so obviously susceptible to abuse.

*Maricle*, 150 S.W.3d 1, 18 (Ky.2004). Despite JUSTICE GRAVES's assertions to the contrary in his opinion, the grand jury is not "controlled" by either the prosecutor or the convening court. *Id.* at 17–18. It is "an investigative body acting independently of either prosecuting attorney or judge." *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). "It acquired an independence in England free from control by the Crown or judges." *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). "The grand jury's functional independence from the Judicial Branch is evidenced both in the scope of its power to investigate criminal wrongdoing and in the manner in which that power is exercised." *United States v. Williams,* 504 U.S. 36, 48, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992). Thus, "[t]he hallmark of the grand jury is its independence from outside influence." *Democratic Party of Ky. v. Graham,* 976 S.W.2d 423, 426 (Ky.1998).

JUSTICE GRAVES's broadside attack on our grand jury system in his separate opinion is both unfounded and ill-conceived. A grand jury not only returns indictments when it has probable cause to believe that a person has committed a criminal offense, it also exonerates without formal charge persons wrongly accused of criminal offenses. *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). At an open-court hearing in the Franklin Circuit Court on October 27, 2005, the foreperson of the grand jury attempted to express the grand jury's frustration at the criticism being directed its way by the Governor's spokespersons and attorneys. Judge Graham wisely terminated the discussion; but the grand jurors do not need to hear the "ham sandwich" claim from a Member of this Court.[43] I would also note that Governor Fletcher has never claimed that he issued his blanket pardon because the persons indicted or being investigated were innocent. As noted, *supra,* the very issuance of the pardon is a recognition of guilt. He apparently believed that the perpetrators should not be punished for their guilt by, *e.g.,* loss of employment similar to the losses they perpetrated against their victims.

JUSTICE JOHNSTONE's opinion asserts without any citation to authority that "[i]t is axiomatic that *grand jury investigations* and indictments are stages in the criminal prosecution of the offense itself." *Ante,* at 363. Not so. Criminal proceedings are initiated "by way of formal charge, preliminary hearing, *indictment,* information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (emphasis added).

The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the

---

**43.** Following the return of the first three indictments, Lieutenant Governor Steve Pence told reporters that "[t]he grand jury is a tool for the prosecutor," and "you could get a ham sandwich indicted." Mark Pitsch, *Grand Jury Criticizes Comment by Pence,* The Courier–Journal, July 1, 2005, at B1. In response, a then-sitting Madison County grand jury issued a report that contained the following:

We are a truly independent body and, while working closely with prosecutors, base our decisions only on the facts and evidence presented and are not unduly influenced by them in our deliberations. We take our roles as Grand Jurors most seriously and are puzzled and slightly insulted by these broad and misguided generalizations. *Id.*

prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. *It is this point, therefore, that marks the commencement of the "criminal prosecutions"* to which alone the explicit guarantees of the Sixth Amendment are applicable.

*Id.* at 689–90, 92 S.Ct. at 1882 (emphasis added).

"There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for *instituting* criminal proceedings . . . ."

*Democratic Party,* 976 S.W.2d at 426 (emphasis added) (quoting *Costello,* 350 U.S. at 362, 76 S.Ct. at 408, and *Rice v. Commonwealth,* 288 S.W.2d 635, 638 (Ky. 1956)). Thus, the grand jury does not conduct criminal proceedings; it initiates criminal proceedings by the return of an indictment.

" 'Indictment' is a technical word, peculiar to Anglo Saxon jurisprudence and implies the finding of a grand jury, as does also the word 'presentment.' " *Rice,* 288 S.W.2d at 637. It is "an accusation made in behalf of the people . . . formed by the concurrence of nine or more grand jurors (Const. § 248) in proper session and is completed by a return or delivery to the court." *Nicholas v. Thomas,* 382 S.W.2d 871, 872 (Ky.1964). Once an indictment is returned, criminal proceedings begin. It is at that point under Section 77 of the Constitution that a pardon may be granted and the legal proceedings interrupted—not before. Therefore, JUSTICE JOHNSTONE's conclusion that a grand jury, especially this grand jury (because it is investigating alleged government corruption), must be instructed that it cannot return an indictment against a person purportedly pardoned by the governor is erroneous.

JUSTICE JOHNSTONE's opinion contains another curious comment: "Common sense and courtesy dictate that, where the subjects of a grand jury investigation have been pardoned and no criminal prosecution of the alleged offenses could ever result, the jurors should be so informed." *Ante,* at 364. In fact, the grand jurors were well aware of the existence of the attempted pardon. They were not sequestered and obviously were exposed to media reports. On October 27, 2005, the grand jury foreperson asked the presiding judge in open court whether the charge to the jury remained the same. Judge Graham responded:

Your charge remains exactly the same. There is a debate going on in light of the Governor's general pardon that he has made pardoning everyone who has done anything to violate the merit system, except himself, up to a certain date. Lawyers in the case, lawyers representing the Governor and lawyers for the prosecution, have an important and substantial legal argument going on as to the effect of the general pardon, if any, on the power of the grand jury. This is a very important question that will be decided by the court later. If the court makes a determination that the general pardon has any effect upon your powers, I will take it upon myself to bring you back into court and so advise you.

In the course of the debate yesterday, the court was asked to instruct the jury that they do not have the power to bring indictments against anyone who has been pardoned. At that time, I decided not to do that because I still have questions in my own mind whether that is a correct statement of the law. I will have to decide that question, and we

have a hearing scheduled to decide that question. They are going to take ten days to brief it, then I'll decide the question. But I declined to tell you people to stop your proceedings until that time. I don't know how you feel about that. I will just say that it is a substantial question that has been raised about the effect of the general pardon. *If you feel, in light of the fact that the question has been raised, you want to refrain from taking action until that question is resolved, that is up to you. I am not telling you to do so.*

Videotape of proceedings, Franklin Circuit Court, Oct. 27, 2005 (emphasis added).

JUSTICE JOHNSTONE's opinion also seems to hold (erroneously, if so) that pardoned or unindicted persons cannot be identified in any report returned by the grand jury.[44] That misconception presumably is premised upon a misreading of *Bowling v. Sinnette*, 666 S.W.2d 743 (Ky. 1984), the case cited by the Governor for that proposition. In *Bowling*, a Boyd County grand jury returned a report indicating that four former sheriffs had engaged in practices contrary to statute, but did not return indictments against them "due to material evidence not being available for our consideration." *Id.* at 744. *Bowling* did not hold that names of persons suspected of criminal activity could not be mentioned in the report absent the return of indictments against those persons. It held that the report could not "cast aspersions on citizens when the evidence before it is insufficient to persuade the members of the Jury that probable cause exists that an offense was committed." *Id.* at 745.

Ordinarily, if the grand jury has probable cause to believe that a person has committed an offense, it will, indeed, return an indictment. However, because of the Governor's purported blanket pardon, now abetted by a majority of this Court, the grand jury is precluded from issuing any indictments based on violations of the merit system statutes prior to August 29, 2005. That does not mean, however, that it does not have probable cause to believe that offenses were committed. If so, *Bowling* does not preclude a full and complete grand jury report that identifies the perpetrators, so long as the grand jury specifies that it has probable cause to believe that the persons named committed the offenses.

Dead kings of England would rise from their graves with huzzas if they knew that one (though only one) jurisdiction of the Anglo–Saxon legal tradition has finally espoused their cause and rolled back hundreds of years of anti-corruption jurisprudence, including the hard-won independence of the grand jury. "But history also has its claims." *Rosenberg v. United States*, 346 U.S. 273, 310, 73 S.Ct. 1152, 1171, 97 L.Ed. 1607 (1953) (Frankfurter, J., dissenting). And history will not forget nor fondly remember the day that the Supreme Court of Kentucky put its imprimatur on a governor's scheme to cover up alleged wrongdoing within his administration by granting a blanket pardon to all persons under investigation by a sitting grand jury.

Accordingly, I dissent.

WINTERSHEIMER, J., joins this opinion.

Concurring in Part and Dissenting in Part opinion by Justice SCOTT.

I concur wholly with Justice Johnstone's Opinion of the Court, except as to the

---

44. As noted *supra*, note 17, JUSTICE JOHNSTONE's opinion is not the majority holding on this issue.

Governor's constitutional power to appoint Special Justices. I write separately, however, regarding the permissible scope of the grand jury report, and to distinguish between individuals indicted before the issuance of the pardon, those indicted after the pardon (amnesty), and those granted amnesty and who will not be indicted.[1]

In the opinion of the court, we state that "[b]ecause the Governor has conceded at oral argument that it is the prerogative of the grand jury to issue a general report of its investigation, *so long as pardoned or unindicted individuals are not specifically identified,* we need not address the issue." I believe the reference, "so long as pardoned individuals are not specifically identified" refers only to those indicted *after the pardon (amnesty) was issued and those who have not, or will not, be indicted.* I also believe we *should* address the issue of the report.

As to the extent of the report, we have said that "a grand jury in Kentucky cannot file a report which reflects on the character of a citizen or public officer *unless that report is accompanied by an indictment against that citizen or officer." Democratic Party of Kentucky v. Graham,* 976 S.W.2d 423, 427 (Ky.1998) (citing *Bowling v. Sinnette,* 666 S.W.2d 743, 745 (Ky.1984)) (emphasis added); *see also Matthews v. Pound,* 403 S.W.2d 7, 10 (Ky.1966). *But see Greenfield v. Courier–Journal & Louisville Times Co.,* 283 S.W.2d 839 (Ky. 1955) (holding that newspaper publication of a grand jury report was privileged, as was the grand jury, even though the public officials against which the report spoke, were not indicted). It is noteworthy that the comment extracted from *Bowling, supra,* was premised upon the statement that the grand jury "should not be permitted to cast aspersions on citizens *when the evi-*

*dence before it is insufficient to persuade the members of the jury that probable cause exists that an offense was committed." Bowling,* 666 S.W.2d at 745 (emphasis added).

In *Matthews, supra,* the Kentucky Attorney General was in the process of conducting a follow-up investigation of the grand jury allegations. There, the court ordered the report—made without any supporting indictments—published to the Kentucky Attorney General, so that the report could be "evaluated as to [any] future official action that may be required." *Matthews,* 403 S.W.2d at 10. The report in *Matthews* indicated "that certain parole board members may be chargeable with activities constituting violations of the law of the Commonwealth." *Id.* at 9. In fact, I found no reported case where we have upheld any damage awards against grand jurors, acting as such. *Cf. Greenfield, supra.* A report without indictments, however, is not in question here, as initial indictments were returned, although later pardoned.

On the other hand, there is authority to say that "Kentucky grand juries can make reports even if not required by law. Typically, these reports relate to grand jury investigations which reveal transactions of questionable propriety, though not criminal." 8 Leslie W. Abramson, *Kentucky Practice, Criminal Practice and Procedure* § 10:31 (4th ed.2003). *See also Bowling, Matthews,* and *Greenfield, supra.* While it is arguable that a grand jury may not file a report reflecting on the character of someone when no indictment is returned against that person, *see Bowling v. Sinnette,* 666 S.W.2d 743 (Ky.1984), there is no reason or justification that has been offered as to why the grand jury cannot

---

**1.** A pardon granted to an identified class of people prior to an investigation or indictment

is an amnesty. However, for the remainder of this opinion I will use the word "pardon."

file a report reflecting on the conduct of state government and the conduct of state *public officials* who have pre-pardon indictments returned against them, regardless of the later pardon.

The opinion of the court is wrought with references to cases and the Debates of the Kentucky Constitutional Convention of 1890, all of which point out that once a pardon has been issued, all legal proceedings against the pardonees must cease as the court is without jurisdiction or constitutional authority to continue. However, the delegates to the Kentucky Constitutional Convention of 1890 did not discuss the effects of a pardon on the report of the grand jury concerning government misconduct or individuals already indicted. Even though criminal proceedings against these individuals must cease as a result of the pardon, that does not mean the grand jury should be prohibited from discussing its conclusions regarding issues of public importance of which all citizens of Kentucky should have knowledge.

Clearly, when the delegates sought to amend the Kentucky Constitution in 1890 by allowing for a pardon in which the governor describes the alleged offense and why the pardon is being issued, they meant to give the citizens of Kentucky a means by which they might know what had happened in a particular situation and why, presumably so that the public could act (vote) accordingly. Having said that, I do not believe that the failure of the Governor's pardon, along with the application therefore, to disclose the actual conduct pardoned in this instance, invalidates the pardon power as Justice Cooper suggests. The pardon power does exist and has been used. Moreover, it is, as was intended, a discretionary power for the Executive. It is one of the inherent powers of government, which traditionally exists with the Executive, unless constitutionally placed

elsewhere. However, without the grand jury's report disclosing the acts (not the evidence) upon which the indictments were premised, the public, in some future event, could very well go uninformed about the details of the situation. People govern themselves and their governments best, when they are knowledgeable about the matters at issue.

"This is [not inconsistent] with the requirement that grand jury proceedings remain secret, RCr 5.24; for one of the reasons for secrecy is to protect witnesses and the good names of innocent persons who are investigated, but not indicted." *Id.* (citing *Greenwell v. Commonwealth,* 317 S.W.2d 859, 861 (Ky.1958)). In fact, RCr 5.24(1) specifically commands, "subject to the authority of the court at any time to direct otherwise, all persons present during any part of the proceedings of a grand jury *shall keep its proceedings and the testimony given before it secret ....*" (Emphasis added). Thus, a report should not recite, or divulge, evidence introduced and supporting the grand jury conclusions. But that is not to say that the report may not recite the conduct the grand jury has probable cause to believe occurred.

One delegate to the Constitutional Convention of 1890 rightly pointed out that "the right of investigation by the Grand Jury is one of the greatest protections the citizen has." Debates, Ky. Constitutional Convention of 1890, Vol. 1, p. 1221.

Another delegate recognized the broad investigative powers of the grand jury when he offered the following resolution: "*Resolved,* That it shall be the duty of the Grand Jury in each county, at least once a year, to investigate the official acts of all officers having charge of public funds, and report the result of their investigations, in writing, to the Court." Debates, Ky. Constitutional Convention of 1890, Vol. 1, p. 265 (resolution offered by Mr. W.R. Ram-

sey, delegate from Laurel and Rockcastle counties).

Although this resolution never made it into the Kentucky Constitution, the notion that the grand jury has these broad investigative powers survives to this day. For example, in *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972), the United States Supreme Court opined that

> [b]ecause [the grand jury's] task is to inquire into the Existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime."

(Quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919)). It is these "broad, independent investigative powers which enable it to bring to light official misconduct and neglect as well as criminal activities which may have been committed or concealed by public officials." 8 Leslie W. Abramson, *Kentucky Practice, Criminal Practice and Procedure* § 10:1 (4th ed.2003).

Therefore, reviewing *Bowling, Matthews,* and *Greenfield,* I necessarily distinguish between an investigation of one's government and its public officials, as has occurred here, and an investigation of private individuals. A distinction is also noted where there is probable cause to believe the conduct occurred. Obviously, the likelihood that injury could occur through the report of the grand jury when no indictment has issued is far greater when a private individual is the subject of the inquiry. Governments have significant as-

sets, and media contacts, with which to defend themselves; individuals, most often, do not.

Thus, in *Greenfield v. Courier–Journal & Louisville Times Co.,* 283 S.W.2d 839 (Ky.1955), this Court addressed the propriety of a newspaper's publication of a grand jury report where *no* indictments had been returned against the subjects. The subjects of that report, city officials, investigated for the commission of crimes while in office, then initiated suit for libel and slander. Although no pardon was at issue, we upheld the publication of the grand jury report as privileged, finding that "[t]he public must be presumed interested in official acts and records." *Id.* at 842. Further, we stated:

> [A] report of this nature may constitute a vicious attack upon one's character and may well offend the American sense of fair play. This was recognized by the trial judge in his excellent opinion. However, we have one of those situations where the right of the individual must be sacrificed to a more compelling public interest.

*Id.*

It is important to point out that in *Bowling, Matthews,* and *Greenfield, supra,* no indictments were returned. Yet, we held in *Bowling* that the grand jury report could not "cast aspersions" on county officials for which the evidence presented was *insufficient to form a basis for an indictment. Bowling,* 666 S.W.2d at 745. We also recognized that a proper remedy was to file a motion to have the circuit judge strike the offending comments, the results of which could be checked in an original action in the Court of Appeals. In *Matthews,* we noted, "it is in the interest of the grand jurors to see that all matter which is believed to be a proper basis for future investigation and prosecution should be included in the report." *Id.* at 10. We then

held that the Kentucky Attorney General was entitled to the full report, including the secret addendums withheld, for use in his further investigation of the matter. *Id.* at 11. In *Greenfield,* we noted a "compelling public interest" in the facts of that case, which are somewhat similar in nature to the allegations at issue here. Thus, in *Greenfield,* we upheld the publication of the grand jury's report without supporting documents and found such publication to be privileged and immune from suit for libel or slander, due to a "compelling public interest" in the substance of the grand jury report.

Here, we have state public officials who allegedly committed crimes while in office—crimes which are alleged to have resulted in the loss of employment for some state merit employees. This creates a much more "compelling interest" for inclusion of the grand jury conclusions regarding the alleged events than the typical situation where an unindicted private citizen is about to be razed by the unsubstantiated conclusions contained in a grand jury's report. Moreover, it is important that the grand jury here found probable cause to believe that a crime was committed as it returned indictments against several public officials prior to the issuance of the pardon. As a delegate to the Kentucky Constitutional Convention of 1890 stated:

> [The] grand jury sit by themselves as an inquisitorial power sworn to do justice and right as much so as a petit jury when they try the question of guilt or innocence. They accuse a man of crime upon what? Not upon rumor, not upon their own volition, but upon legal testimony delivered to them upon the oaths of witnesses.

Debates, Ky. Constitutional Convention of 1890, Vol. 1, p. 1104.

Thus, if a grand jury is to provide some transparency into governmental actions, we should be inclined to allow a grand jury report to contain their conclusory findings of alleged wrongdoings by state officials indicted prior to the issuance of the pardon [2], as well as, the general conduct of the government, or agency involved. And in this last instance—even where no indictments are issued. Were this not so, a future governor might issue a pardon (amnesty) prior to a grand jury investigation, thereby foreclosing the investigation. This should never be an allowed result.

But for the pardon, legal proceedings would continue against those already indicted; as a result of the pardon, legal proceedings must cease. However, the grand jury must still be allowed to perform its function of investigating and issuing a report as it relates to the actions of our government. Although any alleged wrongs will, as a result of the pardon, go untested or unpunished in the legal sense, a government should always be subject to answer in the political arena for any wrongs it is alleged to have committed.

All too often we ignore the constitutional powers specifically retained by the people, exercised by and through their voting power. In this instance, the grand jury is the one agency that has the power (more than any other) to compel public officials to disgorge information as to their conduct and thus, the ability to inform the public of what may or may not have transpired. To deprive the grand jury of the right to discover and disclose their conclusions from the information they receive, robs us, as citizens, of our ability to exercise politi-

---

**2.** Those indicted *after the issuance of the pardon* are thus protected from disclosure through the report, albeit conclusions as to the general conduct of the government, or agency involved, are not.

cal power in an informed manner. Thus, I find the public interest in the alleged violations of the state's merit hiring system by public officials to be just as compelling as the situation in *Greenfield, supra.*

Therefore, I believe it is appropriate to permit the grand jury's report to contain references to those individuals indicted *before the pardon was issued,* as well as, the grand jury's conclusions as to their, and the government's, alleged illicit actions, so that the public may hear both sides of "the story." [3] I say "both sides"—for the government's side will find its way into the public domain too. Thus, the people can listen, evaluate and act accordingly at the polls. This is the constitutional right, and I believe, the obligation, of the people.

> All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness and the protection of property. For the advancement of these ends, they have at all times an inalienable and indefeasible right to … reform … their government in such manner as they may deem proper.

Ky. Const., § 4. For Section 4 to work appropriately, it is imperative that the people always be able to evaluate the conduct of their government. A properly functioning grand jury, made up from the people, will always assist in this regard.

The people of Kentucky have a great sense of right and wrong and can be trusted to decide for themselves if actions or mistakes were political, intentional, or innocent. And much more ominous, to those who would violate their will, there is no wrangling or political appeal from their decision at the polls. So with the knowledge that matters such as this are politically risky, we, as a court, should not expect to be overwhelmed with these matters in the future.

I do not expect partisan Republicans, against whose "political will" the sword of this grand jury is now poised to strike, to understand or approve of the constitutional policy upon which my concurring opinion is based. Nor, do I expect partisan Democrats to appreciate that this same constitutional policy, which they applaud today, will, in the not-so-distant future, be the hand that wields this same sword against them. I do hope, however, that the people of this great Commonwealth and from whom both political parties draw their real strength, will appreciate their rights to be kept informed as to actions of their government through the power of the grand jury, composed "of the people, by the people, for the people" (Abraham Lincoln, *The Gettysburg Address* (Nov. 19, 1863)), and will use it well, both in disciplining and electing their government. It is this policy of responsibly acquiring and disseminating information that the Constitution protects, not the political parties, or their partisans.

Having thus expressed my views on these two subjects, I concur heartily with Justice Johnstone's Opinion of the Court. My only dissent is as to the Governor's right to appoint sufficient justices to constitute a full court. In that regard, I have joined Special Justice Green's opinion.

Opinion by Justice WINTERSHEIMER Concurring in Part and Dissenting in Part.

I concur with that part of the majority opinion entitled "Appointment of Special Justices." However, I must respectfully dissent from the balance of the majority opinion. I join with the dissenting part of Justice Cooper's opinion, but wish to state my views separately.

---

**3.** Again however, RCr 5.24(1) mandates that the evidence heard remain secret, except where otherwise approved, in appropriate situations, by the trial court.

It is my position that the power to pardon has never been granted to conduct prior to an indictment or conviction and because pardons only operate to prevent punishment for a certain crime, a pardon cannot be legally effective until the crimes attempted to be pardoned are made certain through indictment. I definitely agree with the statement of Justice Cooper in his dissent to the effect that pre-indictment pardon would never have occurred to the delegates to the 1892 Constitutional Convention that a valid pardon could be issued before indictment or conviction. If a completely general pardon may be granted, it might lead to extensive abuses. *See Leonard B. Boudin, The Presidential Pardons of James R. Hoffa and Richard M. Nixon: Have the Limitations of the Pardon Power Been Exceeded?*, 48 U. Col. L.Rev. 1, 32–33 (1976). Clearly, a pardon must apply to a specific crime, not to one uncharged or vague.

Again, as correctly noted by the dissenting opinion of Justice Cooper, a quotation from Constitutional Convention delegate Burnham is particularly relevant. It is to the effect that "but whatever the result of the vote may be, let us all hope that the commonwealth will not suffer wrong—'ne quid detrimentum respublica capiat'." This Latin phrase is shortened from a more common caveat or warning to the effect: *caveant consules ne quid detrimentum respublica capiat,* which translated means beware consuls that no harm comes to the state. Consuls, of course, refers to the consulate of the Ancient Roman Senate. *See generally,* William Smith, *Dictionary of Greek and Roman Antiquities,* 408 (1870).

As noted by Justice Graves in his concurring opinion, the entire issue of a pardon in this case may well be a nullity. Nevertheless, I do not support the belief that a pardon issued by the governor may be valid when it is issued prior to any criminal charges coming from a grand jury.

I also disagree with the analysis provided by the majority that the governor has the authority to write a general amnesty. Such power rests in the legislative branch and not the executive. The pardons in question are written as a general amnesty to certain individuals. Amnesty absolves a class of individuals, not named individuals.

Finally, I specifically and vigorously object to any assertion which would allow the executive branch to interfere with the workings of a duly constituted grand jury. Contrary to some views expressed in this case, the grand jury is not a legal fiction, but an integral and independent part of the concept of due process. A party retains the right to request instructions. However, once the circuit judge reaches a decision, the work of the grand jury should not be interfered with by the executive branch. We should not direct the grand jury or the circuit judge otherwise.

COOPER, J., joins.

Opinion by Special Justice GREEN, Concurring in Part and Dissenting in Part.

While I fully concur with the majority opinion as to the merits of this appeal, I feel compelled to extend the analysis in light of the dissents filed herewith. Further, I must respectfully dissent from that portion of the majority opinion as relates to whether the Governor's power under Ky. Const. § 110(3) extended to the appointment of Judge John Knox Mills as a special Justice.

## I. THE MERITS OF THE APPEAL

First, it is my view that the Attorney General's concern for the "independence" of the grand jury is a red herring not at all implicated by the majority opinion. The majority opinion does not in any way "put

its imprimatur on a governor's scheme" of any kind, real or imagined. The grand jury is free to make such reports as are permitted by law,[1] and no one, including the Attorney General, has offered any basis for thinking that an indictment of any particular person facilitates the purported objective of disclosing government wrongdoing.

Second, the definition of the word "pardon" includes amnesty. Justice Cooper's dissent lists a number of federal amnesties that were granted pursuant to the pardon power, which would seem to negate any argument that an amnesty is not permitted. No one has cited a case holding that the pardon power, without some specific limitation, does not include amnesty. In the briefs, both parties referred to events surrounding Governor Bramlette at the close of the civil war as supporting their respective positions. Both parties, and the dissents herein, fail to note that those circumstances were governed by provisions of the constitution not implicated herein. At that time, the pardon power was governed by the Constitution of 1850, which provided in Article III as follows:

> § 10. He shall have power to remit fines and forfeitures, grant reprieves and pardons, except in cases of impeachment. *In cases of treason, he shall have power to grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested;* but he shall have no power to remit the fees of the clerk, sheriff, or Commonwealth's Attorney, in penal or criminal cases.

(emphasis added). Since treason (see Article VIII, § 2) was involved, the Gover-

nor's power was limited, and there is no similar limitation on any other pardon save where impeachment is involved. Thus, the actions of Governor Bramlette say nothing about this case or any other ordinary pardon case.

Third, and most important, is the fact that both dissenting opinions erroneously suggest that a pardon cannot precede indictment. Neither cite any authority for this proposition, and the cases relied upon for other propositions make it obvious that pardons both can and have preceded indictment. The 19th century view of the pardon power on which the dissents rely was first announced by Chief Justice Marshall in *United States v. Wilson,* 32 U.S. 150, 7 Pet. 150, 8 L.Ed. 640 (1833). In that case Wilson had been pardoned for the death sentence portion of a conviction and there was confusion as to the application of the pardon to other lessor offenses. Wilson was asked if he relied on the pardon and advised the court that he had nothing to say. The court did not reach the question of the meaning of the pardon, because it held that the pardon must, like other defenses, be formally pleaded. The historical view of the pardon power was described as follows:

> A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. It is the private, though official, act of the executive magistrate, delivered to the individual for whose benefit it is intended, and not communicated officially to the court. It is a constituent part of the judicial system, that the judge sees only with judi-

---

1. In my view the issue of what reports may be permitted by law is not before the Court. A range of views are expressed in the concurring and dissenting opinions with which I neither join nor take issue with. Given my limited appointment to decide a particular case, I feel it appropriate to refrain from expressing my views on an issue that I do not believe material to the disposition of the issues presented.

cial eyes, and knows nothing respecting any particular case, of which he is not informed judicially. A private deed, not communicated to him, whatever may be its character, whether a pardon or release, is totally unknown, and cannot be acted on.

*Id.* at 160–61, 8 L.Ed. 640. The holding in *Wilson* was that the pardon had to be pleaded, not that acceptance was required, and this proposition was long ago rejected by this court. *Jackson v. Rose,* 223 Ky. 285, 3 S.W.2d 641 (1928). Relying on *dicta* in *Wilson* and Marshall's view of the nature of a pardon, the U.S. Supreme Court subsequently held, in *Burdick v. United States,* 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), that the object of a presidential pardon had the right to reject it. Justice Cooper's dissent cites *Burdick* favorably at least four times. *Burdick* simply repudiates the dissenting views that a pardon must await indictment.

In that case, Burdick, the editor of a New York newspaper, had refused to answer questions posed by a grand jury by claiming his fifth amendment right to refuse self-incrimination. The President issued a pardon to Burdick so that he could not assert the fifth amendment. Burdick had been neither indicted nor accused of a crime. No one in *Burdick* suggested that the pardon was invalid for the reason that there was in the jurisprudence of the United States no reason to suggest a pre-indictment pardon was invalid. This fact also explains 1) why the issue was not seriously debated at any of the Constitutional Conventions, federal or Kentucky and 2) why neither the Attorney general nor the dissents offer authority to support

the proposition. Citing cases from states where the Constitution restricts pardons to post conviction situations does not support the dissent positions, whereas the fact that the drafters of the Kentucky Constitution have repeatedly rejected the post conviction limitation tends to prove the majority's point.

The dissents also ignore the fact that *Wilson* and *Burdick,* to the extent they suggest acceptance was a requirement for a pardon to become effective, were either overruled or severely limited in *Biddle v. Perovich,* 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927). The government in *Biddle* argued that the acceptance requirement did not exist prior to *Burdick,*[2] which the majority referred to as "very persuasive". Justice Holmes rejected the 19th century view of a pardon as described in *Wilson,* and described his view as follows:

We will not go into history, but we will say a word about the principles of pardons in the law of the United States. *A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed.* See Ex parte Grossman, 267 U.S. 87, 120, 121, 45 S.Ct. 332, 69 L.Ed. 527, 38 A.L.R. 131. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent determines what shall be done. So far as a pardon legiti-

---

**2.** The government noted that *Wilson* was premised on English cases which "turned on the necessity that the pardon should be pleaded, but that when it was brought to the judicial knowledge of the Court 'and yet the felon pleads not guilty and waives the pardon, he

shall not be hanged.'" *Jenkins,* 129, Third Century, case 62. The dissenting opinions miss this point as well, which is particularly significant since the Kentucky Court has never accepted the pleading requirement.

mately cuts down a penalty it affects the judgment imposing it. No one doubts that a reduction of the term of an imprisonment or the amount of a fine would limit the sentence effectively on the one side and on the other would leave the reduced term or fine valid and to be enforced, and that the convict's consent is not required.

*Id.* at 486–87, 47 S.Ct. at 665, 71 L.Ed. at 1161–62 (emphasis added). Under the modern view, the pardon power is a public policy tool rather than a mechanism for the granting of mercy. Cases decided by the United States Supreme Court after *Biddle* have tended to treat the pardon power in a manner consistent with Justice Holmes' view,[3] and *Burdick* has not been relied upon by the United States Supreme Court since. While Justice Cooper is correct when he notes that *Burdick* has not

been expressly overruled, most, if not all, commentators seem to agree that *Biddle* is the modern and viable view in the federal system, replacing the 19th century view.[4]

As noted above, this court in *Jackson v. Rose*, 223 Ky. 285, 3 S.W.2d 641 (1928), without referring to *Wilson*, firmly rejected the holding of *Wilson* that a pardon must be pleaded. The following year this court, in *Adkins v. Commonwealth*, 232 Ky. 312, 23 S.W.2d 277 (1929), described at length the 19th century view of the pardon power in much the same way as Chief Justice Marshall described it in *Wilson*, stating that "[t]he granting of a pardon is an act of grace or justice-not on the part of an individual, but on the part of the sovereign." *Id.* at 279. Having stated this, this court rejected the Marshall view as a relic of the past,[5] and then cited *Biddle* for its

---

**3.** See e.g. *Schick v. Reed*, 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974)(although the opinion contains language indicating that the federal judiciary has not fully resolved as to whether the Marshall view is fully abandoned).

**4.** For a compelling analysis of the interplay between the Marshall and Holmes views of the pardon see Buchanan, *The Nature of a Pardon Under the United States Constitution*, 39 Ohio St. L.J. 36 (1978). See also Comment, *Constitutional Law—Presidential Pardons and the Common Law*, 53 N.C.L.Rev. 785, 789 (1974–75)(asserting that in *Biddle* the court abandoned the Marshall view); Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King*, 69 Tex. L.Rev. 569, 595 (1991)(asserting that in *Biddle* the court eschewed the Marshall vision); Ridolfi, *Not Just an Act of Mercy: the Demise of Post-conviction Relief and a Rightful Claim to Clemency*, 24 N.Y.U.Rev.L. & Soc. Change 43, 53–59 (1998)(asserting in Biddle the court "formally abandoned the 'private act of grace' definition of the pardoning power."); Peterson, *Congressional Power over Pardon & Amnesty; Legislative Authority in the Shadow of Presidential Prerogative*, 38 W.F.L.Rev. 1225, 1234 (2003)(noting that the Marshall and Holmes views were different).

**5.** Commissioner Stanley wrote for the Court as follows:

But the claimed divine right of kings and their absolute and arbitrary power are relics of the past. The body of the people is now the sovereign, so there is all the more reason for the rule. The sovereign people through their constitutional compact have delegated power to the court as their agency to determine guilt and apply appropriate remedies and inflict appropriate punishment for the violation of the rights of Society. They have also delegated to the Governor the power to extend mercy and to forgive-not a personal debtor, but a debtor to the body politic. Both the Governor and the court alike are the creatures and servants of the sovereign. Their respective powers emanate from the people. So the act of the Governor in granting a pardon is the official act of an agent, who for the time being has been invested with plenary power and an unlimited discretion as to its use. His motives in exercising that prerogative may not be questioned any more than can the motives of the Legislature in enacting a law or the court in adjudging the law. If the executive acts corruptly or fraudulently in granting a pardon, he is amenable to his master-the people-and punishable

core proposition that a pardonee has no more say in his pardon than he does in his original punishment. *Id.* at 280. Curiously, the court also, in *obiter dictum*, quoted from *Wilson*, which, standing alone, seems to support the idea that a pardon must be accepted to be effective. This *dicta* notwithstanding, the 20th century view of the pardon power has continued to appear in our jurisprudence. In *Hamilton v. Commonwealth*, 458 S.W.2d 166 (Ky.1970), citing and quoting *Biddle*, the court held that the pardon properly commuted the death sentence to life without parole without regard to whether the pardonee consented to the new sentence. *Id.* at 166–67. *See also Commonwealth v. Phon*, 17 S.W.3d 106, 108 (Ky.2000).

It is my belief that there are only two ways to interpret prior Kentucky law, particularly in the context of federal law, both of which arise from constitutional language that is in all material respects identical. I am convinced that at some point in the future the United States Supreme Court will address the issue directly and overrule *Wilson* and its progeny, and that this court could have chosen to ignore them now since this court has never formally adopted the acceptance requirement. However, both the 19th and 20th century views have been recognized in Kentucky jurisprudence and the majority opinion formulates a standard which accommodates both views of the pardon power in the most reasonable manner. It remains to be seen which types of pardons, other than amnesties, require acceptance and which do not, and I do not read the majority opinion as permitting a prisoner to choose his punishment. In addition to these two views of the power itself, the majority opinion prop-

erly seeks to balance the pardon power of the executive with the functions of the judiciary, including the grand jury. I fully concur with the majority opinion on the merits of the appeal both for the reasons set forth therein and those set forth herein.

## II. THE APPOINTMENT OF SPECIAL JUSTICE MILLS

Two Justices determined that they should recuse from hearing this case, and that fact was certified to the Governor in accordance with § 110(3). The Governor then appointed two Special Justices, both of whom were sworn. The Attorney General filed a motion requesting that the Court disqualify the two special Justices. Because recusal is a personal matter to be decided by each particular Justice, this motion was not heard *en banc*. Special Justice Burdette determined that he should recuse from the case and filed a document indicating that he declined the appointment.[6] The Governor then appointed Special Justice Mills, to which the Attorney General filed an objection.

The majority found the appointment of Special Justice Mills to be void, whereas I believe that the plain language of § 110(3) authorized the appointment. That subsection provides:

A majority of the Justices of the Supreme Court shall constitute a quorum for the transaction of business. If as many as two Justices decline or are unable to sit in the trial of any cause, the Chief Justice shall certify that fact to the Governor, who shall appoint to try the particular cause a sufficient number of Justices to constitute a full court for the trial of the cause.

through impeachment, a procedure and power likewise provided by and emanating from the sovereignty.
Id. at 279–81.

6. Having been sworn, Special Justice Burdette had already accepted the appointment and thus this ruling was in effect a recusal.

I take no issue with the majority's observation that, had only one Justice recused from the case, then § 110(3) would not have applied, and that pursuant to Supreme Court Rule 1.020(1)(a) the case would have properly been heard by six Justices. I concur with the majority in rejecting the suggestion that the importance of the case requires a hearing by seven Justices. Moreover, it should be assumed that any case which reaches this body is an important case and it appears to me that each case is treated as such.

The provisions of § 110(3) are triggered by the recusal of two or more Justices. The section does not specify or expressly limit the number of appointments which the Governor may make. Rather, the number is defined by the phrase: "sufficient number to constitute a full court...". There being no question but that the provisions of § 110(3) were triggered in this case, it remains only to decide the question of when § 110(3), having once been triggered, ceases to control the case.

At the outset it should be noted that the number of appointments is not limited to the number of original vacancies. In *Commonwealth v. Smith*, 875 S.W.2d 873 (Ky. 1994) this Court considered a constitutional challenge to tax legislation. Three Justices recused, and Governor Jones appointed three special Justices. The Appellees (the physicians challenging the legislation) filed a motion seeking recusal of the appointees. One of the appointees (who had not yet been sworn) responded by declining the appointment, and the Governor appointed a fourth who was sworn and heard the case. It does not appear that anyone challenged the Governor's ability to make the fourth appointment. Thus, at a minimum it is clear that, once the provisions of § 110(3) are triggered, the number of appointments the Governor can make is not limited to the number of vacancies which occasioned the application of § 110(3).

The majority distinguishes *Smith* on the ground that while four appointments were made, only three, the number of vacancies, were actually sworn in. In other words, the Governor may make as many appointments as necessary to achieve a "full court" of sworn Justices, but once that occurs § 110(3) ceases to control and either two more Justices must recuse or a subsequent recusal is governed by the court's rules. While I agree with the majority that the "seriousness" of the case does not mandate a court of seven Justices at the time of "trial," I believe the language of § 110(3) does.

The language of § 110(3) requires not only the appointment of "a sufficient number to constitute a full court," but further specifies that, from a temporal standpoint, this must occur "at the time of trial". The effect of the majority opinion is to determine that, having appointed two special Justices and bringing the number of Justices to seven (that being a full court), the purpose of § 110(3) has been fulfilled and accordingly the section's operation has ended. Under this theory, once the number of Justices is returned to seven the case reverts to the court's own rules, and since only one Justice recused after achieving a "full court," the court's own rules require the case proceed with six Justices. I cannot concur because the Constitutional provision itself is plain, requires no construction, and is inconsistent with the view taken by the majority. The interpretation given this provision by the majority rewrites the text to read "a sufficient number" to constitute a full court at the time the appointees are sworn. Clearly, the provision, once triggered, requires a "full

court" at the "time of trial".[7]

I must likewise reject the argument that a "full court," as that term as used in § 110(3) has no fixed meaning. If the term means six Justices, then the Governor should not have been able to appoint two special Justices in the first instance. If the term means seven Justices, then the Governor in this case did not appoint (unless Special Justice Mills was permitted to sit) "a sufficient number to constitute a full court at the time of trial." Under the majority view, the term "full court" means both six and seven. More importantly, the term can mean six only so long as the court's rules permit this to be the case. If the Court amended Supreme Court Rule 1.020(1)(a) to allow for the Chief Justice to appoint a Special Justice where there was one recusal, the meaning of "full court" would also be altered to mean seven Justices in all cases. In effect, the majority has decided that the constitutional provision's meaning depends on a rule of court which by definition had not been drafted when the amendment was added to the Constitution. The section in question gives no indication of an intent to delegate its very parameters to the court it created, and instead appears to define a full court in § 110(1), which provides:

> The Supreme Court shall consist of the Chief Justice of the Commonwealth and six associate Justices.

While it is true that six Justices constitute a quorum and can clearly decide a case as well as conduct other business, there is nothing in Ky. Const. § 110 to suggest that a mere quorum is the same as a "full court." Accordingly, I would have over-

ruled the Attorney General's objection and permitted Special Justice Mills to sit during the "trial" of this cause.

GRAVES, J., joins as to Section I and SCOTT, J., joins as to Section II.

---

7. The use of the word "trial" is unfortunate as the court's jurisdiction is appellate and the term is normally associated with the exercise of original jurisdiction. However, in *Smith* the provisions of § 110(3) were applied to appellate jurisdiction, and no one argues that its application should be limited to cases in which original jurisdiction was being exercised. Accordingly, it must mean either the time of oral arguments or the time of decision, with the latter making the most sense. Either way, however, at the time of "trial" in this case there was not a "full court" if that phrase contemplates seven Justices.